EL PUEBLO DE PUERTO RICO, recurrido, *v.* LEONIDES DÍAZ URBINA, acusado y peticionario.

*Número:* CC-2003-271     *Resuelto:* 16 de julio de 2003

*Harry N. Padilla Martínez,* abogado de la parte peticionaria; *Roberto J. Sánchez Ramos,* procurador general, abogado de la parte recurrida.

## RESOLUCIÓN

Se deniega la petición de *certiorari* presentada.

Lo acordó el Tribunal y certifica la Subsecretaria del Tribunal Supremo. Los Jueces Asociados Señores Corrada Del Río y Rivera Pérez disintieron con una opinión escrita. El Juez Asociado Señor Rebollo López no intervino.

(*Fdo.*) Carmen E. Cruz Rivera
*Subsecretaria del Tribunal Supremo*

— O —

Opinión disidente emitida por los Jueces Asociados Señores Corrada Del Río y Rivera Pérez.

La Mayoría ha dispuesto del recurso de epígrafe con un "no ha lugar" a la solicitud de expedición del auto solicitado, declinando ejercer la jurisdicción de este Tribunal sobre el asunto ante nos. Respetuosamente, DISENTIMOS. Lo planteado ante nos presenta la oportunidad de ejercer

1

nuestra jurisdicción para pautar norma jurisprudencial sobre extremos importantísimos del derecho constitucional y estatutario.

## I

Contra el aquí peticionario, Lcdo. Leonides Díaz Urbina, se presentó una denuncia por infracción al Art. 261 del Código Penal de Puerto Rico[1] por hechos imputados como ocurridos el 20 de junio de 2002. La Hon. Elizabeth Linares Santiago, juez municipal, determinó causa probable para el arresto por ese delito. La denuncia[2] presentada dispone lo siguiente:

> El referido acusado Sr. LEO DIAZ URBINA, en fecha, hora y sitio arriba indicado, que forma parte de la jurisdicción del Tribunal de Primera Instancia de Puerto Rico, Sala Superior de San Juan, *ilegal, voluntaria, maliciosa y criminalmente, obrando junto con otros y sin autoridad en Ley, perturbaron la paz y la tranquilidad pública del personal, empleados y funcionarios de la Oficina de la Procuradora de la Mujer, al emplear y utilizar fuerza y violencia, consistente en que el aquí imputado en unión a otras personas que lo acompañaban, penetró e irrumpió en la oficina de la Procuradora de la Mujer, ubicada e[n] la Calle Tetuán N[ú]m. 253 del Viejo San Juan, utilizando diferentes partes de su cuerpo, mediante puños, codazos, manotazos, empujones y de forma atropellante, logrando acceso a la antesala de dicha oficina, resultando lesionadas emocional y físicamente varias personas,* siendo esto [sic] hechos contrario [sic] a la Ley, lo que constituye el delito de Motín. (Énfasis suplido.)

Posteriormente, se celebró la vista preliminar los días 27, 28 y 29 de agosto de 2002, en la cual se presentó la prueba de cargo dirigida a sostener los hechos imputados en la referida denuncia al aquí peticionario, dentro del marco de lo dispuesto en la Regla 23 de Procedimiento Criminal de Puerto Rico[3] y el ordenamiento jurisprudencial

---

[1] 33 L.P.R.A. sec. 4522.

[2] Apéndice de la Petición de *certiorari*, pág. 82.

[3] 34 L.P.R.A. Ap. II.

vigente. Después de evaluada la prueba de cargo presentada durante la celebración de la vista preliminar, la Hon. Lourdes Velázquez Cajigas, juez superior, determinó que existía causa probable para formular una acusación contra el aquí peticionario por el delito de motín, Art. 261 del Código Penal, *supra*.([4])

El 9 de septiembre de 2002 el fiscal José B. Capó Rivera presentó la acusación por el delito de motín contra el aquí peticionario ante el Tribunal de Primera Instancia, Sala Superior de San Juan. El referido pliego acusatorio([5]) dispone lo siguiente:

> El Fiscal formula acusación contra, LEONIDES DIAZ URBINA, por el Artículo 261 del Código Penal, porque allá en o para el día 20 de junio de 2002, y en San Juan, Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala Superior de San Juan, *ilegal, voluntaria, maliciosa a sabiendas y con intención criminalmente, obrando junto con otros y sin autoridad en Ley, perturbaron la paz y la tranquilidad pública del personal, empleados y funcionarios de la Oficina de la Procuradora de la Mujer, al emplear y utilizar fuerza y violencia, consistente en que el aquí imputado en unión a otras personas que lo acompañaban, penetró e irrumpió en la Oficina de la Procuradora de la Mujer, ubicada en la Calle Tetuán número 253 del Viejo San Juan, utilizando diferentes partes de su cuerpo, mediante puños, codazos, manotazos, empujones y de forma atropellante, logrando acceso* a la antesala de dicha oficina, *resultando lesionadas emocional y físicamente varias personas, siendo estos hechos contrario a la Ley.* Lo que constituye el delito de Motín. (Énfasis suplido.)

El 23 de septiembre de 2002, el aquí peticionario presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una solicitud de desestimación de la acusación presentada en su contra por el delito de motín, a través de su abogado, licenciado Harry N. Padilla Martínez.([6])

---

([4]) La celebración de la vista preliminar inició el 27 de agosto de 2002, ante la Hon. Carmen Dolores Ruiz López, quien fue recusada por la representación legal de uno de los imputados de delito, cuya inhibición se produjo ese mismo día.

([5]) Apéndice de la Petición de *certiorari*, págs. 83 y 84.

([6]) Íd., págs. 87–92.

4

Apoyó su pedimento en la Regla 64(p) de Procedimiento Criminal de Puerto Rico[7] y lo resuelto por este Tribunal en *Pueblo v. Tribunal Superior*, 104 D.P.R. 454 (1975); *Rabell Martínez v. Tribunal Superior*, 101 D.P.R. 796 (1973); *Vázquez Rosado v. Tribunal Superior*, 100 D.P.R. 592 (1972), y *Martínez Cortés v. Tribunal Superior*, 98 D.P.R. 652 (1970).

Arguyó el aquí peticionario ante el Tribunal de Primera Instancia que *la mera presencia* de una persona durante la ocurrencia de unos hechos —que dan lugar a la acusación contra varias personas por el delito de motín— no es suficiente para concluir que ésta cometió tal delito. Es necesario que haya participado en su comisión. Alegó que para eso el Art. 261 del Código Penal, *supra*, requiere el empleo de *"fuerza o violencia"* o la amenaza de cualquiera de ellas, acompañada esta última de la aptitud para realizarla, entre otros elementos. Añadió que "para imponer responsabilidad criminal a una persona como autor de un delito es indispensable que ésta haya tomado parte directa en la comisión del delito; instigado, ayudado o cooperado a cometerlo; haberse valido de una persona inimputable para cometerlo o haber ayudado a los que lo cometieron, en cumplimiento de una promesa anterior". *Adujo que para que el Ministerio Público pueda lograr la convicción de una persona acusada por el delito de motín, tiene que presentar prueba de cargo que establezca que el acusado estaba presente y participó en el motín, cuando se le imputó una participación directa en él.*

Argumentó, además, ante el Tribunal de Primera Instancia que durante la celebración de la vista preliminar hubo ausencia total de prueba sobre el hecho de que el aquí peticionario desplegara *"fuerza y violencia"*, mediante la utilización de partes de su cuerpo, así como que utilizara puños, codazos, manotazos, empujones y que actuara en forma atropellante mientras estuvo en el lugar de los

[7] 34 L.P.R.A. Ap. II.

hechos. Adujo que la prueba de cargo presentada en esa etapa procesal tampoco estableció que haya resultado lesionada alguna persona por sus actuaciones. Arguyó, además, que de la referida prueba de cargo se puede apreciar ausencia total de prueba de que el aquí peticionario estuviera involucrado en conspiración alguna, o de que incurriera en designio común con otras personas para cometer el delito de motín.

El aquí peticionario planteó ante el foro primario, como fundamento para solicitar la desestimación de la acusación presentada en su contra, que se le acusó de forma selectiva y por motivo de haber sido Presidente del Partido Nuevo Progresista. Señaló que el Estado utilizó y activó el aparato de procesamiento criminal con el propósito de discriminar en su contra por motivo de sus ideas políticas. Se apoyó en lo resuelto por el Tribunal Supremo de Estados Unidos en *U.S. v. Armstrong*, 517 U.S. 456 (1996); *Wayte v. U.S.*, 470 U.S. 598 (1985), y *Cameron v. Johnson*, 390 U.S. 611 (1968).

El 23 de octubre de 2002 compareció ante el Tribunal de Primera Instancia el Ministerio Público con escrito titulado "Réplica a Mociones de Desestimación", suscrito y firmado por Gabriel V. Redondo Miranda, fiscal auxiliar II, adscrito a la Fiscalía de San Juan. Sostuvo en el referido escrito "que es suficiente que el Ministerio Público presente una scintilla de evidencia sobre todos los elementos del delito imputado y la conexión del acusado con ese delito; esto se traduce a que en la vista de la moción bajo la Regla 64(p), el acusado deberá persuadir al tribunal de que en la vista preliminar hubo una situación de ausencia total de prueba". Expresó que "es insuficiente el planteamiento de los acusados de que en vista preliminar hubo ausencia total de prueba en el sentido que el aquí compareciente desplegara *fuerza o violencia* mientras estuvo en el lugar. De conformidad con el propio texto del Art. 261 del Código Penal, *supra*, es suficiente con perturbar la paz pública

mediante la amenaza de emplear fuerza o violencia, acompañada de la aptitud para realizarla en el acto". (Énfasis suplido.) Añadió el Ministerio Público que "es patentemente frívola la alegación de los acusados de que deben ser exonerados, pues sólo pretendían hacer cumplir una orden de desplegar las dos banderas en una oficina de gobierno. Los acusados no han demostrado que están autorizados en ley para tomarse en sus manos el hacer cumplir una instrucción de la Gobernadora. Es decir, los acusados no son agentes del orden público y actúan ilegalmente cuando pretenden irrumpir en una dependencia pública para fines ajenos a los servicios que provee al público dicha dependencia. También resulta inmaterial que el desorden público se haya originado en relación con el ejercicio de su derecho a la libertad de expresión. En el ejercicio de ese derecho no se puede incurrir en motín".

El Ministerio Público adujo en su escrito ante el Tribunal de Primera Instancia, al oponerse a la solicitud de desestimación que presentó la parte aquí peticionaria, que el acto que desemboca en un motín no tiene que ser ilegal. Afirmó que tampoco tiene que ser ilegal el fin que se persigue mediante ese acto. Lo pertinente es qué ocurrió en la actividad, no cómo comenzó. Expresó que un buen número de motines han tenido su origen en el ejercicio de un legítimo derecho de libertad de expresión y asociación, particularmente en el contexto de huelgas, piquetes u otro tipo de protesta social. Añadió el Ministerio Público que en el curso de la actividad no podían emplear *fuerza o violencia*, o *intimidar* con la *amenaza del uso de tal fuerza o violencia*, con la capacidad para así actuar, y con ello perturbar la paz pública, pues esto constituye el delito de motín que tipifica el citado Art. 261 de nuestro Código Penal. Ello aún en la suposición de que existía alguna obligación de desplegar las dos banderas en la Oficina de la Procuraduría de la Mujer y que los acusados pretendían protestar —en el ejercicio de sus derechos de libertad de expresión y asocia-

ción— porque no se había cumplido con la alegada obligación. Expresó, además, el Ministerio Público que "es inmaterial el que la manifestación del 20 de junio de 2002 estuviera alegadamente amparada en sus derechos constitucionales de libertad de expresión. Como hemos visto, esto no constituye defensa alguna cuando el alegadamente [sic] legítimo ejercicio de un derecho desemboca en alteración a la paz pública por razón de la manera en que se ejercita ese derecho, esto es, con la amenaza o empleo de *fuerza o violencia*". (Énfasis suplido.)

El Ministerio Público arguyó ante el foro primario que para configurarse el delito de motín bajo nuestro Art. 261, *supra*, no es necesario probar que existe un acuerdo previo entre los participantes del motín. Lo que requiere es la participación de dos o más personas. Expresó que los que se unen a la conducta tumultuosa que perturba la paz pública se convierten en participantes en el motín, aunque no haya acuerdo previo alguno. A esos efectos, sostuvo "que no basta la mera presencia en el lugar del motín, pero es suficiente con cualquier acto de apoyo o instigación para continuar con el tumulto, ello en vista del Artículo 35 del Código Penal, el cual incluye como autor de un delito a toda persona que de cualquier modo coopera en la comisión del delito".

Alegó el Ministerio Público que *los elementos constitutivos del delito de motín son*: (1) dos o más personas *obrando juntas*, aunque *sin previo acuerdo*, (2) que *emplean* o *amenazan* con emplear, con la capacidad para ello, *fuerza o violencia*, y (3) *perturbando* así la *tranquilidad pública*. Sostiene que *no son elementos de tal delito* los siguientes:

A) que hubiera un acto ilegal al comienzo de la actividad que degeneró en motín, ni

B) que el motín tuviera su origen en una asamblea ilegal, ni

C) que el fin perseguido mediante los actos de motín sea ilegal, ni

D) que hubiera un acuerdo previo entre los participantes, ni

E) *que se hubiera empleado fuerza o violencia (pues es suficiente con la amenaza del empleo de tal fuerza o violencia acompañada con la aptitud para realizarla), ni*

F) *que hubiera "intención" como forma de la culpabilidad bajo el Artículo 14 del Código Penal, pues es suficiente con la negligencia.* (Énfasis suplido.)

Arguyó el Ministerio Público que el planteamiento de procesamiento selectivo no es propio para presentarlo en etapa de vista preliminar y bajo lo que estipula la Regla 64(p) de Procedimiento Criminal, *supra.* Señaló, además, que el aquí peticionario no presentó evidencia alguna durante la vista preliminar para sostener tal planteamiento. Expresó que *todas* las personas que fueron identificadas y cometieron el delito de motín —según la investigación razonable de buena fe que condujo el Ministerio Público— han sido denunciadas o referidas a la Oficina del Fiscal Especial Independiente. Adujo que el aquí peticionario no *alegó ni probó que existía alguna persona específica, de ideología partidista distinta a la de ellos, que haya incurrido en motín en el día y lugar en que se le imputa amotinarse, y que el Ministerio Público conociendo su identidad y conducta no haya tomado acción al respecto.* Expresó que el peticionario tampoco alegó que en alguna situación similar o análoga el Ministerio Público no haya investigado y procesado a los autores del motín.

Finalizó su escrito el Ministerio Público expresando lo siguiente:

En cuanto al acusado Leo Díaz, *la prueba estableció que éste usó fuerza y violencia para irrumpir en la agencia, acto que perturbó la tranquilidad pública.* Ello surge del testimonio del Sr. Roberto García Vázquez. También quedó demostrado que este acusado, *mediante el uso de la fuerza, logró acceso al "lobby"* de la Oficina de la Procuraduría de la Mujer, *contribuyendo en la colocación por la fuerza de la bandera de los Estados Unidos y a la comisión del delito de motín ese día. Como mínimo, la prueba estableció la probabilidad de que el acusado fue co-autor del delito de motín al haber cooperado, ayudado e instigado en la comisión de dicho delito por otras personas.* (Énfasis suplido.)

El 4 de noviembre de 2002, la parte aquí peticionaria presentó ante el Tribunal de Primera Instancia un escrito

titulado "Moción Reiterando Solicitud de Desestimación y en Réplica a Escrito Presentado por el Estado titulado Réplica a Mociones de Desestimación".[8]

Planteó el peticionario ante el foro primario que lo alegado por el Ministerio Público en la denuncia, y en la acusación de la cual se solicitó la desestimación, cuyo contenido es similar o igual a la denuncia, no concuerda con lo expresado en su escrito en oposición a la moción de desestimación. *Arguyó que el Estado por primera vez y en ese escrito, hizo alusión a que la prueba presentada estableció la probabilidad de que el acusado, aquí peticionario, fue coautor del delito de motín al haber cooperado, ayudado e instigado a otras personas en la comisión del delito. Expresó que en esa etapa procesal el Estado habló por primera vez de la ausencia de intención y de la presencia de negligencia criminal. Afirmó que, huérfana la prueba de cargo del elemento de intención, "se recurre en forma socorrida a la negligencia criminal". No obstante, adujo que tales argumentos están en conflicto con el texto de la denuncia y del pliego acusatorio del que se solicitó la desestimación. En ambos, adujo que se alegó intención.*[9]

El 4 de noviembre de 2002 el aquí peticionario presentó un escrito ante el Tribunal de Primera Instancia titulado "Moción Solicitando se Espere por Transcripción para Resolver Moción de Desestimación".[10] Expresó que era indispensable la transcripción de la evidencia presentada durante la celebración de la vista preliminar para atender y resolver la moción de desestimación presentada ante el Tribunal de Primera Instancia, Sala Superior de San Juan.

El 18 de noviembre de 2002 el Estado, representado por el Fiscal, Hon. Gabriel O. Redondo Miranda, presentó otro escrito ante el foro primario titulado "Segunda Moción en

---

[8] Íd., págs. 116–124.

[9] En la denuncia se le imputó al aquí peticionario que incurrió en la conducta en forma "voluntaria" y "maliciosa", y en la acusación se le imputó en forma "voluntaria", "maliciosa" y con "intención criminal".

[10] Apéndice de la Petición de *certiorari*, págs. 125–127.

Oposición a Desestimación por la Regla 64(p) de Procedimiento Criminal". *Arguyó que eran errados los argumentos esbozados por la defensa en cuanto a la significación de los términos "fuerza y violencia" que requiere el motín. La fuerza o violencia a la que se refiere el delito de motín es cualquier conducta susceptible de causar "terror o alarma" en una persona promedio. Afirmó que no son necesarios actos específicos de fuerza física contra la persona ni contra la propiedad para que quede constituido el delito de motín. Adujo que "lo expresado en las acusaciones es inconsecuente porque el tribunal, en vista preliminar, puede determinar causa probable por el delito que la prueba establezca, independientemente del delito imputado o de lo expresado en la denuncia".* (Énfasis suplido.)

Arguyó el Ministerio Fiscal en el referido escrito que no había dicho "que la conducta de los acusados fue negligente, sino que el delito de motín es uno que puede ser cometido negligentemente". Sobre este asunto, expresó el Ministerio Público lo siguiente:

> ... *La conducta de los acusados fue a todas luces intencionales según el Artículo 15(b) en la modalidad de que el sujeto activo conocía que como una consecuencia probable de sus actos se perturbaría la paz pública. El problema es que, a pesar de que la conducta de los acusados fue intencional, el delito de motín es uno que puede ser configurado con negligencia. Por dicha razón, no es suficiente como fundamento para desestimar el alegar que no hubo "intención". En el ordenamiento jurídico penal de Puerto Rico todos los delitos, en principio, son punibles a modo de intención o de negligencia. Para que un delito se pueda cometer solamente de forma intencional es necesario que el legislador específicamente lo cierre a la negligencia utilizando lenguaje tal como: intencionalmente, voluntariamente, maliciosamente, etc. Si el legislador no utilizó este lenguaje en el delito en cuestión, rige el Artículo 14 del Código Penal que establece que todo delito se puede cometer basándose en intención o negligencia. Esto significa que en Puerto Rico rige un sistema abierto a la negligencia que, en principio, hace punible negligentemente todo delito a menos que el legislador explícitamente rechace esta contención.* (Énfasis suplido.)

Añadió, sobre el mismo tema, lo siguiente:

> ... *Para cerrar el delito a la negligencia sería necesario que el legislador lo haga explícitamente. El delito de motín no hace referencia alguna a que la conducta debe ser intencional o maliciosa.* Por lo tanto, quedando claro que en Puerto Rico rige un sistema abierto a la negligencia, cabe decir con toda corrección que el delito de motín se puede cometer negligentemente. Esta es la realidad de nuestro ordenamiento jurídico penal. (Énfasis suplido.)

No obstante, el Ministerio Público sostuvo que lo anterior es un *"argumento residual"*, porque el acusado, aquí peticionario, *no sólo fue negligente, sino que actuó de manera intencional.* Afirmó que el peticionario actuó de manera intencional si ocurrió una de tres cosas: (1) el acusado tiene como su propósito perturbar la paz pública; (2) el acusado conoce que la perturbación de la paz pública es una consecuencia natural de su conducta, o (3) el acusado conoce que la perturbación de la paz pública es una consecuencia probable de su conducta. *Alegó que el peticionario conocía que su conducta tendría como consecuencia probable la perturbación de la paz pública. Adujo que el delito de motín está abierto a la negligencia y el peticionario fue cuando menos negligente, pues debió conocer que su conducta perturbaría la paz pública, y aunque se considere que el delito de motín requiere el elemento de intención, la conducta del peticionario efectivamente fue intencional, porque de las circunstancias que rodearon el delito se deduce que conocía que como consecuencia probable de sus actos podría perturbar la paz pública.* Expresó *"que una persona puede ser partícipe de un motín con el simple hecho de utilizar la marca o emblema del grupo que se está amotinando".* (Énfasis suplido.) Afirmó *que el peticionario fue partícipe del delito de motín, porque su acto de presencia en el lugar de los hechos se debió a gestos de apoyo a su líder y no a curiosear o a socorrer a las víctimas.* Sostuvo *que el peticionario "apoyó, ayudó, instigó y cooperó" en la comisión del delito mediante su presencia y actos afirmati-*

vos ese día. Añadió que *"la prueba demostró que, como mínimo, los acusados acudieron al lugar para apoyar y cooperar con la conducta allí realizada, conducta que conocían que probablemente podría perturbar la paz pública"*. (Énfasis suplido.)

El 2 de diciembre de 2002, el Hon. Heriberto Sepúlveda Santiago, juez superior, celebró la vista correspondiente para atender y resolver la solicitud de desestimación que presentó el peticionario. Durante esa vista, el referido magistrado, las partes y sus abogados observaron el video presentado en la vista preliminar. Se sometió el incidente con una transcripción oficial de los hechos acaecidos durante la celebración de la vista preliminar, así como una serie de fotografías y el referido video. El Tribunal de Primera Instancia dictó una resolución el 10 de diciembre de 2002, en la cual declaró sin lugar la solicitud de desestimación que presentó el aquí peticionario.[11] *Concluyó el foro primario que la participación activa del aquí peticionario, junto a otros tres acusados, lo convirtió en autor del delito. Determinó que éste no fue un mero observador. Infirió que el peticionario llegó al lugar en apoyo del Dr. Carlos I. Pesquera Morales para cooperar con éste, y que con sus actos afirmativos "ayudó, apoyó, instigó y cooperó" en la comisión del delito de motín. Concluyó, además, que el testigo, señor Roberto García Vázquez, ubicó al aquí peticionario en el grupo de personas que estaban después de los que se encontraban pegados a la puerta y que tuvo acceso al interior del edificio. Determinó que el video observado durante la vista lo ubicó directamente detrás del Dr. Carlos I. Pesquera Morales, utilizando "fuerza y violencia" para lograr acceso a la Oficina de la Procuraduría de la Mujer, "cosa que lograron juntos".*

*El Tribunal de Primera Instancia determinó que el planteamiento sobre procesamiento selectivo no se podía levantar en la vista preliminar, y menos aún en la moción de*

---

[11] Íd., págs. 684–697.

*desestimación bajo la Regla 64(p) de Procedimiento Criminal*, supra. *Sostuvo que la decisión de a quién y cuándo imputar el delito le corresponde a la Rama Ejecutiva, a través de sus agencias investigativas. Por tal razón, no atendió ni resolvió el referido planteamiento.*

El Lcdo. Leonides Díaz Urbina presentó ante el Tribunal de Primera Instancia una moción de reconsideración a la resolución para declarar sin lugar su solicitud de desestimación de la acusación formulada en su contra.[12] El Tribunal de Primera Instancia emitió una resolución en la que declaró no ha lugar la moción de reconsideración.[13] Presentó una segunda moción de reconsideración,[14] que fue declarada sin lugar.[15]

Inconforme con la decisión del Tribunal de Primera Instancia, el licenciado Díaz Urbina acudió ante el Tribunal de Circuito de Apelaciones, mediante un recurso de *certiorari*.[16] Ese foro le concedió un término al Procurador General para expresarse. El licenciado Díaz Urbina señaló como errores del Tribunal de Primera Instancia los siguientes:

1. Cometió error el Honorable [sic] Tribunal de [Primera] Instancia al resolver que el delito de motín según tipificado en el Art. 261 del Código Penal, sólo requiere el elemento mental de intención general y no de la intención específica; según estos conceptos son pautados en los Arts. 14 y 15 de dicho Código.

2. Cometió error el Honorable [sic] Tribunal de [Primera] Instancia al denegar la Moción de Desestimación presentada por el acusado y peticionario, descartando la figura de la mera presencia, la cual era claramente aplicable al caso, y lo que obligaba a dicho foro a desestimar el pliego acusatorio, pues el mismo estaba cimentado en una determinación de causa pro-

---

[12] Íd., págs. 698–714.

[13] Íd., págs. 715–716.

[14] Íd., págs. 717–721.

[15] Íd., pág. 722.

[16] Íd., págs. 49–722.

bable contraria a derecho; ya que ésta fue efectuada existiendo una ausencia total de prueba.

3. Cometió error el Honorable [sic] Tribunal de [Primera] Instancia al negarse a resolver la solicitud de desestimación presentada por el acusado y peticionario, bajo la figura del encauzamiento [sic] selectivo; lo que se traducía en una determinación de causa contraria a derecho.

Arguyó el peticionario ante el Tribunal de Circuito de Apelaciones que erró el Tribunal de Primera Instancia al interpretar el delito de motín —como está definido en el Código Penal— como si se tratara de un delito de intención general. *Expresó que los elementos de "fuerza o violencia" o la amenaza de su uso, acompañada de la aptitud para realizarla, son fundamentales en la tipificación del delito de motín, pues presuponen intención específica. Adujo que el Tribunal de Primera Instancia al interpretar y aplicar el Art. 261 del Código Penal, supra, bajo el cuadro fáctico de autos, incurrió en un vicio constitucional. Expresó que la actividad del 20 de junio de 2002 era de naturaleza político-partidista y que su encausamiento, en ausencia de prueba de "fuerza o violencia" de su parte, se tradujo en una restricción de los derechos que le garantiza la Primera Enmienda de la Constitución de Estados Unidos. Alegó que el Estado puede intervenir legítimamente con la expresión de un ciudadano cuando existe un interés o propósito de salvaguardar el orden público y evitar que esa persona, en designio común con otro, en el uso de "fuerza o violencia" o amenaza de su uso, acompañado de aptitud para su uso, tenga la "intención y el propósito específico" de perturbar la tranquilidad pública. Afirmó que del pliego de la denuncia, en el cual se alegó que la conducta del aquí peticionario fue "ilegal, voluntaria, maliciosa y criminalmente", se le imputó "intención específica". Sostuvo que bajo ninguna circunstancia se puede avalar la conclusión del foro primario de que el delito de motín, tal y como está redactado en nuestro Código Penal, sea de intención general.*

El peticionario señaló ante el Tribunal de Circuito de

Apelaciones que el Tribunal de Primera Instancia tuvo ante sí, para resolver su solicitud de desestimación, la transcripción de los incidentes acaecidos durante la celebración de la vista preliminar los días 27, 28 y 29 de agosto de 2002; las cincuenta y seis fotos que presentó el Ministerio Público y un video editado que no contiene audio, cuya duración es de aproximadamente un minuto. Señaló, además, que el Tribunal de Primera Instancia le imprimió una gran importancia al contenido del referido vídeo para sostener su dictamen al declarar no ha lugar la solicitud de desestimación. Sobre este asunto, el aquí peticionario hizo alusión a lo siguiente en su recurso de *certiorari*, refiriéndose a expresiones contenidas en el dictamen del Tribunal de Primera Instancia:

Si entendiéramos que su participación refleja una mera presencia, ya con anterioridad hubiésemos desestimado este cargo, *pero la prueba, a nuestro juicio, no refleja eso y sí en cambio demostró una participación activa en los hechos, específicamente al momento de intentar tener acceso a las escaleras del interior de la oficina.*

La posición de la defensa, a los efectos de que su parti[cipa]ción (señor Díaz Urbina) fue "luego de que empleados de la Oficina de la Procuraduría de la Mujer abrieran la puerta del frente de dichas facilidades, [é]ste caminó de la calle, la acera y pisó el interior de dicha facilidad gubernamental" no está sostenida por la prueba. *S[ó]lo bastaría referirnos al v[í]deo admitido y podemos ver la participación activa del señor acusado estando directamente detrás del señor Pesquera Morales.* En este particular no podemos compartir la apreciación del compañero que representa al señor Díaz Urbina a los efectos de que lo único que se le ve es entrando a las facilidades en unión otras personas. (Énfasis suplido.)

El peticionario le señaló al Tribunal de Circuito de Apelaciones que, en aras de ser lo más preciso posible, gestionó y obtuvo, por orden del Tribunal de Primera Instancia, copia del vídeo que se presentó en evidencia. El contenido de ese video se transfirió a una computadora y se reprodujo en fotos. Esas fotos se presentaron ante el Tribunal de Pri-

mera Instancia. Afirmó que en las fotos se puede cotejar el incidente en detalle y con calma. Expresó que de las fotos identificadas con los números 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 17, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31,33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53 y 54 *no surge la presencia del aquí peticionario.* Añade que *se puede apreciar la presencia del peticionario* en las fotos identificadas con los números 14, 15, 16, 18, 19, 32, 37 y 43, en medio de un grupo de personas que entraron a las facilidades de la Oficina de la Procuraduría de la Mujer. Señaló que era cierto que el aquí peticionario estuvo en un momento dado detrás del Dr. Carlos I. Pesquera Morales, pero que tal hecho no configura el delito de motín.

Alegó el aquí peticionario ante el Tribunal de Circuito de Apelaciones que el análisis de la evidencia presentada en la vista preliminar no sostiene las conclusiones del Tribunal de Primera Instancia, a los efectos de que el contenido del video que ubicó al aquí peticionario directamente detrás del Dr. Carlos I. Pesquera Morales reflejara que utilizó *"fuerza y violencia"* para lograr acceso a la Oficina de la Procuraduría de la Mujer, y que tal objetivo lo lograron juntos. Afirmó que tal situación no lo demostraron el video, las fotos o los testimonios.

Señaló el licenciado Díaz Urbina que de un análisis de la evidencia no se deduce su *"participación activa" como autor del delito de motín,* tal y como concluyó el Tribunal de Primera Instancia. Afirmó que, en el caso de autos, *la evidencia no demostró un designio común del peticionario con otra persona dirigido a cometer el acto antijurídico. Tampoco fue alegado en la denuncia el elemento de designio común.*

Arguyó el peticionario ante el foro intermedio apelativo, *que la evidencia en ningún momento demostró su participación en acto alguno dirigido al empleo de "fuerza o violencia"* que *perturbara la tranquilidad pública.* Afirmó, además, que la evidencia presentada estuvo huérfana de lo

alegado, a los efectos de que el peticionario utilizara diferentes partes de su cuerpo para lograr acceso a las facilidades de la aludida oficina; menos aún, que usara puños, codazos, manotazos, empujones o que actuara en forma atropellante como alude la denuncia. Señaló como errónea, a base de la evidencia presentada, la conclusión del Tribunal de Primera Instancia, a los efectos de que podía inferir válidamente que el aquí peticionario llegó al lugar de los hechos en apoyo del doctor Pesquera para cooperar con éste, y que con sus actos afirmativos "apoyó, instigó y cooperó" en la comisión del delito de motín.

El peticionario planteó ante el Tribunal de Circuito de Apelaciones *que el foro primario erró al no atender su alegato sobre encausamiento selectivo junto a otras personas, todos líderes prominentes del Partido Nuevo Progresista. Señaló que de un examen de la totalidad de la evidencia desfilada surge que en el lugar había "más de 100" personas y estaban "pilladas". No obstante, afirmó que el Estado, a través de la Policía y del Departamento de Justicia, sólo sometió a un proceso criminal al peticionario y a otros tres líderes del Partido Nuevo Progresista. Arguyó que el momento indicado —a tenor con la Regla 64 de Procedimiento Criminal—*([17]) *para solicitar la desestimación de la acusación es "mediante moción presentada al hacerse alegación de no culpable o antes de alegar". Si no lo plantea en ese momento, "constituirá una renuncia de la misma". Sostuvo que la propia prueba presentada por el Ministerio Público evidencia su alegación de que ha sido encausado selectivamente. Señaló que en el lugar de los hechos hubo periodistas que incurrieron en el delito de daños a la propiedad, y que empleados de la Oficina de la Procuraduría de la Mujer incurrieron en el delito de agresión y no han sido encausados.*

---

([17]) 34 L.P.R.A. Ap. II.

El Tribunal de Circuito de Apelaciones le concedió al Procurador General término para expresar su posición respecto al recurso de *certiorari*.[18]

El 25 de febrero de 2003, la Oficina del Procurador General presentó ante el Tribunal de Circuito de Apelaciones un documento titulado "Escrito en Cumplimiento de Orden",[19] suscrito por el Hon. Roberto Sánchez Ramos, procurador general de Puerto Rico. Señaló *"que el delito de motín tipificado en el Artículo 261 del Código Penal no es uno de intención específica"*. Afirmó que *"cabe, pues, el motín por conducta negligente, esto es, emplear fuerza o violencia (o amenazar emplearla con la aptitud para así hacerlo) negligentemente con el efecto de perturbar la tranquilidad pública"*. (Énfasis suplido.) *Arguyó que el delito de motín no contiene referencia a un estado mental. Puntualizó que eso significa que para determinar cuál es el "mens rea" que exige el delito de motín es necesario acudir al precepto penal que contiene el Art. 14 del Código Penal de Puerto Rico.*[20] Este estatuto, aplicado al delito de motín, según el Procurador General, *"deja claro que la acción u omisión que resultare en el delito de motín puede ser cometida tanto con intención como con negligencia"*. (Énfasis suplido.)

Por otro lado, arguyó el Procurador General que *"en el caso de marras es suficiente con que el imputado, en unión a otras personas, incurriera en acciones u omisiones que resultaron en perturbación de la tranquilidad pública. No es necesario que el imputado hubiera dirigido su acción u omisión a perturbar la tranquilidad pública. No es pertinente el 'propósito' de la acción u omisión, por más loable que le parezca a muchos. Ni siquiera es necesario que la perturbación de la paz pública sea el resultado natural o necesario del motín resultante. Es suficiente con que la per-*

---

[18] Apéndice de la Petición de *certiorari*, pág. 24.

[19] Íd., págs. 25–48.

[20] 33 L.P.R.A. sec. 3061.

*turbación de la paz pública sea consecuencia probable de la acción u omisión imputada, pues así lo dispone el Artículo 15(b) del Código Penal".* (Énfasis suplido.)

El Procurador General señaló en su escrito ante el Tribunal de Circuito de Apelaciones que el peticionario se equivocó de foro y lo insta a dirigir su reclamo a la Asamblea Legislativa para que enmienden los Arts. 15 y 261 del Código Penal, *supra.*

Arguyó el Procurador General al Tribunal de Circuito de Apelaciones que *"lo que está en juego es si la presencia del acusado en el lugar de los hechos, ya sea explícita o implícitamente, incitó o ayudó a los demás participantes en la situación antijurídica a continuar con el delito".* (Énfasis suplido.) Sostuvo que *"la presencia del acusado detrás y al lado del señor Carlos Pesquera, no sólo constituía un aliento para que se continuara con la situación antijurídica, sino que además añadía fuerza numérica al grupo que, congregados, perturbaban la paz pública. Nótese que el acusado no llegó al lugar por mera casualidad, como podría ocurrir con los transeúntes que estaban cerca de la Procuraduría de la Mujer cuando se desencadenaron los hechos. Tampoco llegó el acusado a detener la situación antijurídica que allí acontecía (o sea, la perturbación de la paz pública). Además, el acusado es un reconocido líder político puertorriqueño, que ha ocupado posiciones de importancia y cuya presencia no puede más que contribuir a caldear los ánimos de los que estaban allí presentes. No se puede inferir otra cosa que no sea el que el acusado llegó al lugar con el fin de aplaudir y apoyar los actos antijurídicos e incrementar la fuerza numérica de los presentes. Esto es suficiente para poder imputarle la autoría de conformidad con el Artículo 35(b) del Código Penal.* Se puede razonablemente inferir que su conducta *incitó y ayudó* a perturbar la paz pública. Las circunstancias que rodearon la conducta del acusado dejan claro su aprobación de la situación antijurídica ahí realizada". (Énfasis suplido.) *Anadió* que *"la*

*conducta del acusado era de naturaleza tal que la única inferencia razonable que se puede hacer es que llegó al lugar aprobando la situación antijurídica. El acto del acusado de entrar en la Procuraduría de la Mujer una vez el coacusado Pesquera logró su entrada, fortalece aún más la inferencia de que la llegada del acusado tenía el propósito de ayudar a la perturbación de la paz pública proveyendo fuerza moral y numérica al grupo de manifestantes. Nada más es necesario para considerarlo coautor según las exigencias del Artículo 35(b) del Código Penal".* (Énfasis suplido.)

En cuanto al planteamiento de encausamiento selectivo, el Procurador General señaló que el peticionario no presentó prueba alguna en la vista preliminar o en la vista bajo la Regla 64(p) de Procedimiento Criminal, *supra*, para sostenerlo. *No produjo prueba sobre personas de otra colectividad política que incurrieran en la misma conducta y que, conociéndolo el Ministerio Público, no presentó acusaciones contra ellos. Puntualizó que el peticionario tenía que establecer ante el Tribunal de Primera Instancia qué personas no pertenecientes a la clase alegadamente discriminada incurrieron en igual conducta y no fueron procesados. Afirmó que tenía que probar el elemento de deliberación, y que no aportó prueba contundente de un propósito discriminatorio.*

El 6 de marzo de 2003, el Tribunal de Circuito de Apelaciones emitió una sentencia, a través del panel compuesto por su Presidenta, la jueza Rodríguez de Oronoz, la jueza Peñagarícano (ponente) y la jueza Bajandas Vélez, cuya copia de notificación a las partes se archivó en autos el 14 de marzo de 2003.[21] Mediante la referida sentencia se confirmó la resolución recurrida.

Concluyó el Tribunal de Circuito de Apelaciones que *"el Ministerio Público no adviene obligado a demostrar durante la vista preliminar que tiene prueba contra el imputado que establece todos los elementos del delito imputado en la denuncia".* (Énfasis suplido.) Añadió que, a nivel de

---

[21] Apéndice de la Petición de *certiorari*, págs. 1–22.

vista preliminar, el Ministerio Público no está forzado a probar su caso más allá de duda razonable. Concluyó, además, *"que en la vista preliminar no es necesario que el Estado pruebe a cabalidad todos los elementos del delito imputado, como tendría que hacerlo en la etapa de juicio. Es por ello, que —a modo de ejemplo— el Ministerio Público no tenía que probar en esta etapa, que el peticionario utilizó 'las distintas partes de su cuerpo' para poder cumplir con el 'quantum' de prueba necesario.* Destacó, además, que la prueba de autos, respecto a la probabilidad de participación del peticionario, ha sido aquilatada por magistrados a nivel de Regla 6 y de vista preliminar". (Énfasis suplido.)

El Tribunal de Circuito de Apelaciones fundamentó su decisión en que el Art. 261 del Código Penal, *supra*, según tipificado, *no incluye el elemento de "intención específica" de llevar a cabo la conducta prohibida. Sostiene que es suficiente la "intención general" de cometer el delito de motín, o sea, que independientemente que de la conducta desplegada no se desprenda que se quería perturbar la tranquilidad pública, basta con que esa sea la consecuencia natural o probable, o que tal resultado hubiese sido razonablemente previsible.* Concluyó que de la prueba testifical y documental presentada y apreciada por el foro de primera instancia se deduce que al peticionario lo identificaron varios de los testigos de cargo. Puntualizó que de la transcripción que contiene el apéndice de su recurso surge que los referidos testigos de cargo ubicaron al aquí peticionario en los eventos que dan margen al caso de autos. Determinó que *"para los efectos de la vista preliminar el Ministerio Público cumplió con la evidencia requerida para demostrar la probabilidad de que el imputado participase en los eventos en controversia.* Ello, en consideración de que el peso de la prueba requerido al Ministerio Público en esta etapa es modesta por demás". (Énfasis suplido.)

Sobre el planteamiento de encausamiento selectivo que levantó el aquí peticionario ante el Tribunal de Primera

Instancia, el cual no atendió ni resolvió este foro primario, expresó el Tribunal de Circuito de Apelaciones lo siguiente:

*Resulta evidente, que al peticionario le asiste aún la facultad de alegar la aludida defensa con anterioridad al juicio.* Por su parte, el tribunal recurrido podrá atender las alegaciones, a modo de ejemplo, mediante una moción al amparo de la Regla 9 de Evidencia. *El asunto neurálgico lo es, que estamos impedidos de actuar en esta etapa en ausencia de una decisión del Tribunal de Primera Instancia respecto al alegado encausamiento selectivo.* No obstante, precisa destacar que el peticionario deberá presentar su defensa acorde a lo expresado por la jurisprudencia aplicable. Así, el Tribunal Supremo de Puerto Rico ha expresado, que cuando la defensa de encausamiento selectivo se urde en aras de lograr la exoneración de cargos criminales, los tribunales federales han adoptado las siguientes directrices:

a. *El peticionario tendrá que presentar una moción con anterioridad al juicio.*

b. *Será preciso, además, que éste alegue hechos suficientes de forma que la aludida defensa "… rebase la etapa de frivolidad, para que proceda la celebración de una vista evidenciaria…."*

c. *La referida vista se justifica, cuando "… se desprende que existen hechos tendentes a demostrar encausamiento selectivo o que levanten dudas sobre las motivaciones del Ministerio Fiscal al acusar…." Pueblo v. Rexach Benítez, supra,* a la pág. 317.

Lo anterior significa, que primero el imputado tendrá que presentar *alegaciones lo suficientemente meritorias para que sobrepasen la frivolidad; y que de su faz, el Magistrado de Instancia entienda que probablemente se ha discriminado insosteniblemente en contra del mismo. Meras alegaciones son insuficientes* en derecho para sostener la aludida defensa. *Pueblo v. Rexach Benítez,* supra. Sólo entonces, le correspondería al peticionario probar que en efecto el Estado ha actuado en violación a la constitución, y de forma selectiva en contra del imputado.

*El peticionario, pues, tendría que alegar que a personas similarmente situadas no se les procesó criminalmente, además de que las actuaciones del Estado son intencionales y están basadas en la mala fe. Pueblo v. Rexach Benítez,* supra, a la pág. 314. (Énfasis suplido.)

Añadió el Tribunal de Circuito de Apelaciones que en

*Pueblo v. Rexach Benítez*, 130 D.P.R. 273 (1992), este Tribunal expresó lo siguiente:

> [L]os criterios para determinar *si procede* la consideración de la defensa son totalmente distintos a los que se han establecido para que *progrese la misma*. El *peso probatorio* para establecer *lo segundo* es mucho más oneroso *que el primero*. (Énfasis suplido y en el original.)[22]

Determinó que siendo el encausamiento selectivo materia de defensa afirmativa a levantarse en el foro de primera instancia, que conlleva establecer un efecto discriminatorio en la aplicación de la ley a su caso, y que el proceso en su contra fue motivado por esas razones, y considerando que la actuación del Estado está cobijada por la presunción de corrección, corresponde al aquí peticionario alegar y probar lo contrario. *Concluyó que la alegación de encausamiento selectivo levantada por el peticionario ante el Tribunal de Primera Instancia no era suficiente para que ese tribunal, en la etapa procesal en que se encontraba el caso de autos, desestimara la acusación formulada contra el aquí peticionario.*

Inconforme con el dictamen del Tribunal de Circuito de Apelaciones, el Lcdo. Leonides Díaz Urbina acudió oportunamente ante este Tribunal, mediante un recurso de *certiorari.*

Por las razones expuestas a continuación, expediríamos el auto solicitado. Disentimos de la inacción de la Mayoría sobre los asuntos de marcada importancia que contiene el asunto ante nos. Veamos.

---

[22] Tal expresión es parte de la opinión concurrente y de conformidad emitida por el Juez Asociado Señor Hernández Denton en *Pueblo v. Rexach Benítez*, supra, pág. 317.

## II

*Motín*

> *Todo empleo de fuerza o violencia, que perturbare la tranqui-*
> *lidad pública, o amenaza de emplear tal fuerza o violencia,*
> *acompañada de la aptitud para realizarla en el acto, por parte*
> *de dos o más personas, obrando juntas y sin autoridad de ley,*
> *constituye motín,* y toda persona que participare en un motín
> será sancionada con pena de reclusión por un término fijo de
> dos (2) años. De mediar circunstancias agravantes, la pena fija
> establecida podrá ser aumentada hasta un máximo de tres (3)
> años; de mediar circunstancias atenuantes, podrá ser redu-
> cida hasta un mínimo de un año.
> El tribunal, a su discreción, podrá imponer la pena fija de
> reclusión establecida o pena de multa que no excederá de dos
> mil dólares o ambas penas. (Énfasis suplido.)[23]

El Art. 14 del Código Penal de Puerto Rico[24] dispone lo
siguiente:

> *Nadie podrá ser sancionado por una acción u omisión que la*
> *ley provee como delito si la misma no se realiza con intención o*
> *negligencia criminal.*
> *La intención o la negligencia se manifiestan por las circuns-*
> *tancias relacionadas con el delito, la capacidad mental y las*
> *manifestaciones y conducta de la persona.* (Énfasis suplido.)

El Art. 15 del Código Penal de Puerto Rico[25] dispone lo
siguiente:

> El *delito es intencional*:
> (a) Cuando *el resultado ha sido previsto y querido* por la
> persona *como consecuencia* de su *acción* u *omisión* o
> (b) Cuando *el resultado, sin ser querido, ha sido previsto por*
> *la persona como consecuencia natural* o *probable* de su *acción*
> *u omisión.* (Énfasis suplido.)

---

[23] Art. 261 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 4522.

[24] 33 L.P.R.A. sec. 3061.

[25] 33 L.P.R.A. sec. 3062.

El Art. 16 del Código Penal de Puerto Rico[26] dispone lo siguiente:

Responde por *negligencia la persona que ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley.* (Énfasis suplido.)

La controversia trabada entre las partes reside, entre otras, en una diferencia abismal en la interpretación que le imprimen a los elementos que configuran la tipificación del delito de motín, y cómo se establecerán a nivel de vista preliminar, donde se determina si existe causa probable para formular una acusación por delito grave contra una persona ante la Sala Superior del Tribunal de Primera Instancia.

El Ministerio Público alega que el delito de motín se estableció en cuanto al aquí peticionario, a nivel de vista preliminar, con una *scintilla* de prueba. Sostiene que se estableció que el peticionario participó directa y activamente en la conducta delictiva imputada sobre el fundamento de que es suficiente probarle que sus acciones, dentro del marco de tal dimensión, produjeron la perturbación de la tranquilidad pública de los empleados de la Oficina de la Procuraduría de la Mujer como una consecuencia probable de su conducta, o que era previsible para él que así fuera. En la alternativa, alega que se estableció, en esa etapa de los procedimientos, que el peticionario ayudó, apoyó e instigó a otros de los acusados y cooperó con ellos al éstos desplegar, alegadamente, una participación directa y activa en la conducta delictiva imputada. En esta última modalidad, y con el propósito de ilustrar el alcance de los términos "apoyar, instigar y cooperar", el Ministerio Público indica que una persona podría ser partícipe de un motín con el simple hecho de utilizar la marca o el emblema del grupo que se está amotinando. Expresa que no

---

[26] 33 L.P.R.A. sec. 3063.

son elementos del delito de motín el designio común de dos o más personas con la intención específica de perturbar la tranquilidad pública con el uso de fuerza o violencia, o la amenaza de su uso con aptitud para desplegarla. Expresa que para que un delito requiera el elemento de intención específica, el legislador le tiene que adscribir los términos "voluntaria", "maliciosa" o "intencionalmente", en la tipificación y definición del delito. De no haberse incluido esos términos, el Ministerio Público considera que fue la intención legislativa no requerir tal requisito como elemento del delito. Bastaría con que se pudiera establecer el delito en cuestión probando negligencia o intención general. Puntualiza que la "*fuerza o violencia*" a que alude el estatuto penal en cuestión no se refiere a actos específicos de fuerza física contra los empleados de la Oficina de la Procuraduría de la Mujer ni contra la propiedad de éstos, o de esa entidad gubernamental. Basta con que la "*conducta*" desplegada cause "*terror o alarma*" en una persona promedio. Afirma que el delito de motín no requiere que se pruebe que se incurrió en tal "*fuerza o violencia*" en conjunto con un estado mental de propósito de perturbar la tranquilidad pública. Basta, según el Ministerio Público, con que esa sea la consecuencia probable, o que sea previsible tal resultado en una persona promedio. No obstante, en la denuncia presentada, el Ministerio Público alegó que el aquí peticionario incurrió en la conducta delictiva imputada —en la modalidad de participación activa y directa— en una forma "*ilegal, voluntaria, maliciosa y criminalmente obrando junto con otros*". Además, alegó que el peticionario incurrió en la misma conducta delictiva previamente imputada en forma "*ilegal, voluntaria, maliciosa, a sabiendas y con intención criminalmente*", *obrando con otros*. En ambas se describió su participación como una *activa y directa en la utilización de* "*diferentes partes de su cuerpo, mediante puños, codazos, manotazos, empujones y de forma atropellante*". (Énfasis suplido.)

El peticionario alega que el delito de motín requiere que se establezca en la vista preliminar, con una *scintilla* de prueba, todos sus elementos, que incluye un designio común de dos o más personas con la "*intención específica*" de perturbar la tranquilidad pública mediante el uso de "*fuerza física o violencia*", o la amenaza de su uso con aptitud para desplegarla. Sostiene que el Ministerio Público no probó en la vista preliminar, con una *scintilla* de prueba, todos los elementos del delito, así como tampoco sostuvo, en esa etapa de los procedimientos, aquellos elementos del delito imputados en la denuncia, en la que describió la conducta delictiva imputada como voluntaria, maliciosa y desplegada con su participación activa y directa mediante el uso de "*fuerza y violencia*", a través de los medios ya mencionados. Añade que tampoco probó el "apoyo, instigación y cooperación" del peticionario con otros de los imputados en la alegada participación directa y activa de éstos en la conducta delictiva imputada.

*Principio de legalidad*

El principio de legalidad es un conjunto de reglas cuyo común denominador es la justificación para que la intervención del Estado en los asuntos de los individuos —en una sociedad libre y democrática como la nuestra— se fundamente en la ley y no en el poder absoluto o en la fuerza bruta. El principio de legalidad es un ideal adoptado por nuestra sociedad como parte de nuestros valores democráticos, y está relacionado directamente con el derecho al debido proceso de ley que consagra la Constitución de Puerto Rico y la de Estados Unidos. Constituye un límite al Poder Legislativo en la formulación de política pública al aprobar estatutos penales. Requiere que en ese ejercicio el legislador es-

pecifique cuál es el ámbito de lo que constituye conducta delictiva.([27])

La premisa básica del principio de legalidad se puede resumir en que la ley escrita es la única fuente del derecho penal.([28]) La jurisprudencia no es fuente directa de creación de derecho penal en Puerto Rico. La función de los tribunales es aplicar e interpretar la ley penal. En algunos casos la jurisprudencia puede dar lugar a normas jurídicas, pero no crea ni cambia la ley penal sustantiva, sólo interpreta la voluntad de la ley. En nuestra jurisdicción existe la doctrina del precedente. Éste se refiere a que la norma interpretativa de la ley emana de las decisiones del tribunal de mayor jerarquía en casos y controversias decididas. Esa teoría descansa en aplicar la norma a unos hechos similares a los que dieron lugar a su formulación.([29])

La costumbre es fuente de interpretación del derecho penal, a modo de excepción en aquellos casos en que la ley utilice expresiones amplias y genéricas, cuyo significado tendrá que determinarlo el juzgador usando el lenguaje común y corriente. En estos casos, el Art. 6 del Código Penal de Puerto Rico([30]) dispone que "las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente".([31])

Los principios generales del Derecho, si no se concretan en preceptos de derecho penal escritos, tampoco son fuente del derecho penal por razón del principio de legalidad. Así, por ejemplo, si el hecho no está tipificado como delito, aun cuando esté en oposición a los principios generales de justicia, no generará responsabilidad penal. En el derecho civil

---

([27]) D. Nevares-Muñiz, *Derecho penal puertorriqueño: parte general*, 4ta ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 2000, pág. 69.

([28]) Nevares-Muñiz, *op. cit.*, pág. 72; Art. 8 del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3031; *Pueblo v. Santiago*, 98 D.P.R. 82 (1969).

([29]) Nevares-Muñiz, *op. cit.*, págs. 72 y 73.

([30]) 33 L.P.R.A. sec. 3021.

([31]) Nevares-Muñiz, *op. cit.*, pág. 73.

los principios generales del Derecho son fuente jurídica supletoria; no así en el derecho penal.[32]

El principio de legalidad está íntimamente relacionado con el hecho de que en el derecho penal solamente la ley escrita es fuente de derecho. La fuente de producción del derecho penal es únicamente el Estado, ya que este es el que puede ejercer la voluntad para dictar normas jurídicas.[33] En nuestro entorno ese ejercicio está avalado por la naturaleza democrática de la selección de nuestro Gobierno (Ramas Ejecutiva y Legislativa) y por las limitaciones que le impone la Constitución de Puerto Rico y de Estados Unidos a la autoridad gubernamental frente al individuo en el ejercicio de tal poder.

El Art. 8 del Código Penal de Puerto Rico, *supra*, prohíbe la creación de delitos y sanciones por analogía. Este estatuto dispone lo siguiente:

> *No se instará acción penal contra persona alguna por un hecho que no esté expresamente definido por la ley como delito, ni se impondrán penas o medidas de seguridad que la ley no hubiere previamente establecido.*
>
> No se podrán crear por analogía delitos, penas, ni medidas de seguridad. (Énfasis suplido.)

*Analogía* es la semejanza de una relación. El término implica un razonamiento previo.[34] En el derecho penal se reconocen dos tipos de analogía: *la analogía legal* y la *analogía jurídica*. La *analogía legal* consiste en la aplicación de la ley a un caso que ella no contiene. Ésta se obtiene acudiendo a otro precepto de la ley que regula el caso afín, aplicándolo al caso en cuestión mediante analogía. La *analogía jurídica* consiste en la aplicación de los principios generales del Derecho. Ésta surge cuando la regla para el caso omitido se deduce del ordenamiento jurídico tomado en su totalidad.[35]

---

[32] Íd.

[33] Íd.

[34] Íd., pág. 75.

[35] Íd., págs. 75–77.

## Vaguedad

El principio de *"nullum crimen sine lege praevia"* impide que alguna persona sea sancionada penalmente, a menos que preceda a su conducta la descripción clara de ésta como delito en un estatuto. La prohibición de las leyes vagas surge del principio de legalidad y responde al requisito de que las leyes deben dar aviso adecuado de las consecuencias penales de determinada conducta. Es parte, además, de las limitaciones del poder del Estado frente al derecho constitucional de los individuos a un debido proceso de ley. De ahí que la claridad y precisión de una ley de naturaleza penal es condición de su validez.[36] Existen tres fundamentos para declarar nula una ley por razón de vaguedad: (1) que la ley no ofrezca a una persona prudente y razonable una advertencia adecuada sobre cuál es la conducta prescrita o prohibida; (2) que la ley propicie su aplicación arbitraria y discriminada, y (3) que la ley intervenga con derechos constitucionales fundamentales.[37]

En *Vives Vázquez v. Tribunal Superior*, 101 D.P.R. 139, 145–146 (1973),[38] citando a *Grayned v. City of Rockford*, 408 U.S. 104 (1972), nos expresamos de la forma siguiente:

> *"Es un principio básico del debido procedimiento que una ley es nula por vaguedad si sus prohibiciones no están claramente definidas. Las leyes imprecisas violentan diversos valores importantes.* Primero, porque asumimos que el hombre es libre para elegir entre la conducta legal e ilegal, insistimos que las leyes den a la persona de ordinaria inteligencia una oportunidad razonable para saber qué está prohibido, de modo que pueda actuar en concordancia con ese conocimiento. Las leyes imprecisas pueden engañar al inocente al no proveer un aviso adecuado. *Segundo, si ha de prevenirse la aplicación arbitraria y discriminatoria, las leyes deben proveer normas claras*

---

[36] Íd., pág. 109; *Pueblo v. Burgos Torres*, 120 D.P.R. 709 (1988); *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988).

[37] Nevares-Muñiz, *op. cit.*, págs. 109–110; *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972); *Winters v. New York*, 333 U.S. 507 (1948); *Lanzetta v. New Jersey*, 306 U.S. 451 (1939).

[38] Véase *Pueblo v. Hernández Colón*, 118 D.P.R. 891, 899 (1987).

*para aquellos que las aplican. Una ley vaga delega, de modo no permisible, cuestiones básicas de política a policías, jueces y jurados para ser resueltas sobre bases subjetivas y ad hoc, con los consiguientes peligros de aplicación arbitraria y discriminatoria. Tercero, pero relacionado, cuando un estatuto impreciso 'empalma con áreas sensitivas de las libertades básicas garantizadas por la Primera Enmienda' 'opera para inhibir el ejercicio de [esas] libertades'. Los significados inciertos inevitablemente llevan a los ciudadanos a 'permanecer mucho más lejos de la zona ilegal' ... que si las fronteras de las áreas prohibidas estuviesen claramente demarcadas."* (Énfasis suplido y en el original.)

El examen judicial que se debe utilizar para determinar si una ley es vaga, es si el lenguaje da un aviso definido con respecto a la conducta proscrita de acuerdo al significado y práctica comunes. En ese examen se debe considerar si una persona de inteligencia común puede entender, sin tener que adivinar, el tipo y ámbito de la conducta proscrita o prohibida, así como el sujeto a quien está dirigida. Como se trata de imponer responsabilidad penal, los requisitos de certidumbre del estatuto son más estrictos que los de las leyes civiles. De ahí, que el delito tiene que estar claramente tipificado con todos los elementos definidos de manera inteligible. La ley debe ser lo suficientemente clara y precisa como para satisfacer el debido proceso de ley.[39]

Los tribunales al aplicar el examen sobre la vaguedad de un estatuto penal necesariamente lo interpretan. El hecho de que haya que interpretar la ley no quiere decir que es vaga. Al examinar un estatuto penal no estamos limitados en forma exclusiva al texto de la ley, sino que podemos considerar el contexto de sus términos y la interpretación de la intención legislativa. *El límite al ámbito permisible de interpretación judicial de una ley penal es que no requiera una construcción amplia para salvar su validez, ya*

---

[39] Nevares-Muñiz, *op. cit.*, págs. 110–111.

*que de requerirse tal interpretación el estatuto sería vago.*[40]

Cuando la vaguedad de la ley estriba en que ésta invita a una aplicación arbitraria y discriminatoria, lo que sucede es que la ley, por ser imprecisa, no provee a las personas que la aplicarán criterios adecuados para ejercer su discreción. El problema en estos casos es que resulta peligroso si la Asamblea Legislativa establece una red lo suficientemente grande como para abarcar a todos los delincuentes y le deja a los jueces, policías y fiscales el poder de determinar quién puede ser sujeto de procesamiento criminal y quién no. Ciertamente ello viola el principio de legalidad, el debido proceso y la igual protección de las leyes.[41] No obstante, no debe confundirse una ley vaga que propicia la aplicación discriminatoria con el hecho de que toda ley, al ser aplicada, supone el ejercicio de cierta discreción: los policías deciden si formularán cargos o no, el fiscal si procesará o no y por qué delitos, los jueces determinarán causa probable para arrestar y acusar. Todos estos funcionarios ejercen su discreción al aplicar la ley. *El examen para determinar si la ley es vaga es si permite su aplicación discriminatoria contra ciertos grupos de personas porque no provee criterios para orientar el ejercicio de la discreción al aplicarla.*[42]

*En los casos de vaguedad por amplitud excesiva,* el problema no es la mera ausencia de notificación adecuada, *sino que por razón de la aplicación amplia y arbitraria de la ley se restrinjan irrazonablemente y hasta se violen derechos protegidos por la Primera Enmienda de la Constitución de Estados Unidos y por el Art. II, Secs. 2 y 3 de la Constitución de Puerto Rico, L.P.R.A., Tomo 1. Por razón del impacto adverso que puede tener una ley penal imprecisa o vaga cuando se aplica sobre derechos protegidos*

---

[40] Íd., pág. 111.

[41] Íd.

[42] Íd., pág. 112.

*constitucionalmente, el examen judicial es más riguroso en
los casos de amplitud excesiva que en los demás casos.* La
vaguedad en situaciones de ese tipo es muy costosa. No
sólo se infringen los requisitos de aviso razonable y aplica-
ción indiscriminada, *sino que la ley genera una inhibición
de conducta constitucionalmente protegida.*(43)

En la esfera federal se ha discutido extensamente la doc-
trina de la vaguedad de un estatuto. Esta doctrina emerge
como consecuencia del principio constitucional que le garan-
tiza a los ciudadanos un debido proceso de ley.(44) La doc-
trina de vaguedad de una ley se utiliza en la esfera federal
para evaluar, por ejemplo, leyes que restringen la libertad
de expresión, entre ellos, estatutos penales.(45)

La referida doctrina postula, *como un principio cardinal
del debido proceso de ley*, que un estatuto es inconstitucional
por adolecer de vaguedad cuando falla en proveerle un aviso
razonable a los ciudadanos de las conductas que proscribe, o
*cuando no le provee suficientes guías a los funcionarios que
están encargados de ponerla en vigor; permitiendo así su
aplicación arbitraria y discriminatoria.*(46) Los fundamentos
en que se sostiene la doctrina de vaguedad de un estatuto
están claramente formulados por el Tribunal Supremo de
Estados Unidos en *Grayned v. City of Rockford*, supra, págs.
108–109, donde se dispuso lo siguiente:

> It is a basic principle of due process that an enactment is
> void for vagueness if its prohibitions are not clearly defined.
> Vague laws offend several important values. First, because we
> assume that man is free to steer between lawful and unlawful

---

(43) Íd.

(44) *Kolender v. Lawson*, 461 U.S. 352 (1983); *Smith v. Goguen*, 415 U.S. 566
(1974); *Grayned v. City of Rockford*, supra. Véanse, además: W.B. Lochart *et als., The
American Constitution: Cases and Materials*, 5ta ed., Minnesota, West Publishing
Co., 1981; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foun-
dation Press, 1988.

(45) *Chicago v. Morales*, 527 U.S. 41 (1999); 4 *Treatise on Constitutional Law:
Substance and Procedure* (1999).

(46) *Chicago v. Morales*, supra; *Kolender v. Lawson*, supra; *Smith v. Goguen*,
supra; *Grayned v. City of Rockford*, supra.

conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. *Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an "ad hoc" and subjective basis, with the attendant dangers of arbitrary and discriminatory application.* (Énfasis suplido y escolios omitidos.)

*El permitir que los funcionarios encargados de aplicar una ley penal, o que intervenga con los derechos constitucionales de los individuos, lo hagan de manera arbitraria o caprichosa, y utilizando como único criterio su voluntad o preferencias, es constitucionalmente impermisible.*([47]) *De hecho, es precisamente la posibilidad de que la ley se pueda aplicar de manera arbitraria y discriminatoria —por no existir guías que delimiten la discreción de los funcionarios gubernamentales— lo que viola el principio constitucional del debido proceso de ley.*([48]) *La importancia de que el legislador establezca guías adecuadas para orientar y limitar la discreción de los funcionarios encargados de implantar las leyes de naturaleza penal o punitiva es tal que el Tribunal Supremo de Estados Unidos ha resuelto que la premisa más importante de la doctrina de vaguedad de una ley descansa sobre la ausencia de las antes mencionadas guías.*([49]) El mejor ejemplo de la importancia que reviste el que existan guías adecuadas en una ley penal lo encontramos en la expresión del Tribunal Supremo de Estados Unidos en *Kolender v. Lawson*, supra, págs. 357–358, donde se dispuso lo siguiente:

Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently

---

([47]) *Chicago v. Morales*, supra; *Kolender v. Lawson*, supra; *Smith v. Goguen*, supra; *Papachristou v. City of Jacksonville*, supra.

([48]) *Smith v. Goguen*, supra.

([49]) *Kolender v. Lawson*, supra; *Smith v. Goguen*, supra.

that the more important aspect of the vagueness doctrine "is not actual notice, *but the other principal element of the doctrine —the requirement that a legislature establish minimal guidelines to govern law enforcement. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections".* (Énfasis suplido y citas omitidas.)

Rotunda y Nowak expresan sobre el tema de vaguedad y la Primera Enmienda de la Constitución de Estados Unidos lo siguiente:

Several rationales require special judicial strictness when reviewing laws that regulate fundamental constitutional rights, such as the freedom of speech, assembly, or association, to insure that such regulations are not vague. *First, the requirement that a law place persons on notice as to precisely what activity is made criminal is of special importance when the activity distinguishes between criminal activity and activity that constitutes a fundamental constitutional right. To the extent that the law is vague and relates to fundamental constitutional rights, it might have an "in terrorem" effect and deter persons from engaging in activities, such as constitutionally protected speech, that are of particular constitutional importance. In other words, an unclear law regulating speech might deter or chill persons from engaging in speech or activity with special protection under the Constitution.* On the other hand, an unclear law relating to business property use, such as an unclear zoning statute, would only chill activity without special constitutional significance (until such time as the statute is clarified by appropriate state courts).

*A second, and more important, reason for enforcing the void for vagueness doctrine is to require that there be clear guidelines to govern law enforcement. Without such clear guidelines, law enforcement officers have discretion to enforce the statute on a selective basis. This discretion is most dangerous when the law regulates a fundamental right, such as speech or travel, so that the officers might be subjecting persons to arrest and prosecution either because they disagree with the message that the person wishes to convey in his speech or for some other constitutionally suspect reason.*

*Third, because the First Amendment needs breathing space, the governmental regulation that is tolerated must be drawn with "narrow specificity." Such narrow, clear statutes are more*

*likely to reflect the considered judgment of the legislature that certain speech activities must be regulated.*

*Moreover there is a special danger of tolerating in the First Amendment area "the existence of a penal statute susceptible of sweeping and improper application .... These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." As a result the doctrine consists of a strict prohibition of statutes that burden speech in terms that are so vague as either to allow including protected speech in the prohibition or leaving an individual without clear guidance as to the nature of speech for which he can be punished.* (Énfasis suplido y escolios omitidos.)([50])

Establecidos los fundamentos de la doctrina de la vaguedad de un estatuto, según interpretada en la esfera federal, nos corresponde analizar el tratamiento brindado a esa doctrina en la jurisdicción local. Veamos.

Al igual que en la esfera federal, la doctrina de inconstitucionalidad por vaguedad de una ley ha sido discutida en repetidas ocasiones por este Tribunal al analizar la disposición que garantiza el debido proceso de ley en la Constitución de Puerto Rico. Hemos resuelto que una ley adolece de vaguedad si sus prohibiciones no están claramente definidas.([51])

En *O.E.G. v. Cordero, Rivera,* 154 D.P.R. 827 (2001), expresamos que una ley es nula por vaguedad cuando sus prohibiciones no están definidas claramente *o cuando no previenen su aplicación arbitraria, porque no le proveen al funcionario encargado de su aplicación normas claras y precisas que guíen su discreción.* La doctrina de vaguedad de una ley aplica cuando se trata de estatutos penales, aun cuando éstos no restrinjan el derecho a la libertad de expresión, y está íntimamente relacionada con el debido proceso de ley garantizado por nuestra Constitución.([52]) La doctrina de vaguedad descansa sobre la premisa de

---

([50]) *Treatise on Constitutional Law,* supra, Vol. 4, Sec. 20.9, págs. 274–276.

([51]) *Pacheco Fraticelli v. Cintrón Antonsanti,* 122 D.P.R. 229 (1988).

([52]) *U.N.T.S. v. Srio. de Salud,* 133 D.P.R. 153 (1993).

que los estatutos deben dar un aviso razonable a la ciudadanía sobre lo que está prohibido y, además, *deben proveer a aquellos que las aplican normas claras que prevengan la aplicación arbitraria o discriminatoria del estatuto.*[53]

En *Pacheco Fraticelli v. Cintrón Antonsanti,* supra, establecimos que el Estado y sus subdivisiones políticas tienen la facultad inherente de establecer reglamentación, *pero es su obligación proveer guías y normas adecuadas para evitar que los funcionarios encargados las apliquen arbitrariamente.* Una ley que no le provee un aviso adecuado al ciudadano de inteligencia común sobre los aspectos que prohíbe, *o que le deja la puerta abierta para que los funcionarios gubernamentales la apliquen arbitraria y caprichosamente, viola el principio básico del debido proceso de ley y es nula por vaguedad.*[54]

*Una ley es inconstitucional de su faz no por la forma particular en que se empleó en un determinado caso, sino por la posibilidad de que pueda aplicarse de manera arbitraria o inconsistente en otras situaciones.*[55]

## Vaguedad v. Interpretación

Aplicar una ley a los hechos de un caso presupone un proceso evaluativo del cual se deduzca si puede una persona promedio puede entenderlo. No existe en realidad una ley que no requiera, como cuestión de umbral, que la interpreten cuando se inicia su proceso de aplicación. La interpretación de la ley se debe adecuar a unos principios jurídicos básicos que orienten al juez en su proceso de aplicarla a unos hechos, conforme al debido proceso de ley y el principio de legalidad. De ahí, la necesidad de unas reglas

---

[53] *O.E.G. v. Cordero, Rivera,* supra, opinión concurrente del Juez Asociado Señor Corrada Del Río, a la cual se unió el Juez Asociado Señor Rivera Pérez.

[54] *Velázquez Pagán v. A.M.A.,* 131 D.P.R. 568 (1992); *Pacheco Fraticelli v. Cintrón Antonsanti,* supra; *Vives Vázquez v. Tribunal Superior,* supra.

[55] Íd.

de interpretación que sean jurídicamente aceptables.[56] Existe una diferencia entre *la vaguedad en un estatuto y una mera ambigüedad.* Cuando una ley *es vaga*, no es susceptible de interpretación para aplicarla a unos hechos. No obstante, si la ley *es meramente ambigua*, procede su interpretación con tal propósito, aplicando las reglas jurídicas apropiadas.

En *Vives Vázquez v. Tribunal Superior*, supra, pág. 145, citando a *Pueblo v. Tribunal Superior*, 81 D.P.R. 763, 788 (1960), expresamos, sobre el tema, lo siguiente:

> *"No debe caerse en la superficialidad de creer que una ley penal es nula por defecto de vaguedad debido a que requiera interpretación.* Como señala el maestro Jiménez de Asúa, todas las leyes, aun las 'clarísimas', requieren interpretación. 'Toda ley, por el hecho de aplicarse es interpretada, ya que al cotejar su contenido con el hecho real se produce un proceso de subsunción, al que contribuyen los órganos interpretativos (a veces el legislador y el científico y siempre el Juez), por procedimientos gramaticales y teleológicos, y con resultados declarativos, restrictivos, extensivos o progresivos.' *En cuanto a las leyes penales 'hay que armonizar la estricta legalidad del Derecho punitivo, con la imprescindible interpretación teleológica de las normas jurídicas. Reconociendo que el Derecho penal tiene carácteres de mayor certidumbre y estabilidad que las otras ramas, es imposible creer que la ley penal, sensu strictu, se basta del todo a sí misma y que sea suficiente interpretarla a la letra.* No es un sistema completo y sin lagunas, de modo que con el simple procedimiento lógico, basado en los preceptos legales escritos, se puedan resolver todas las cuestiones'." (Énfasis suplido y en el original.)

## Reglas de interpretación vigentes en Estados Unidos

El Tribunal Supremo de Estados Unidos le ha otorgado una dimensión muy particular a las normas de interpretación de estatutos penales. El desarrollo de este tema en ese Alto Foro produjo la norma de interpretación conocida como "regla de lenidad" (*rule of lenity*). Esta norma de interpretación se aplica en aquellos casos en que el estatuto

---

[56] Nevares-Muñiz, *op. cit.*, págs. 112–113.

penal es ambiguo en un ámbito en particular. Su efecto será no aplicar la ley al acusado o interpretarla lenientemente. Esta regla no se puede invocar a menos que la ambigüedad sea genuina y no se pueda resolver de la faz de la ley ni del examen del historial legislativo. La regla se fundamenta en el debido proceso de ley que requiere que no se obligue a ninguna persona a especular —sobre si su conducta está prohibida o no— bajo la inminencia de una acusación; así como también en asegurar que la Rama Legislativa utilice la precisión adecuada al demarcar el ámbito de la conducta penal.([57])

El Tribunal Supremo de Estados Unidos ha aplicado la regla de lenidad a dos situaciones diferentes. *La primera es cuando el estatuto penal prohíbe cierta conducta y la controversia a resolver es si la actuación del acusado cae dentro del ámbito sustantivo de la prohibición de la ley. Siendo ambiguo el estatuto, si la intención legislativa no es clara, las dudas se resolverán a favor del acusado.* El *segundo* tipo de asunto en que se ha aplicado la regla de lenidad es aquel en que la controversia es en relación a la severidad y a los efectos del castigo que autoriza el Congreso de Estados Unidos para un delito en particular, manifestándose la norma en contra de la pena más severa.([58])

*El más Alto Foro de Estados Unidos ha sido claro en que la regla de lenidad no aplica a menos que haya una ambigüedad genuina en la ley, la cual no se pueda resolver mediante el análisis e interpretación del lenguaje estatutario y del historial legislativo. No se puede invocar la regla de lenidad para interpretar la ley penal de manera tan restrictiva que derrote la intención obvia de la Legislatura.*([59])

---

([57]) Nevares-Muñiz, *op. cit.*, págs. 122–123; *Dunn v. United States*, 442 U.S. 100 (1979); *Huddleston v. United States*, 415 U.S. 814, 831 (1974); *Rewis v. United States*, 401 U.S. 808, 812 (1971); *Bell v. United States*, 349 U.S. 81, 83 (1955).

([58]) Nevares-Muñiz, *op. cit.*, pág. 123.

([59]) Íd., pág. 124; *Huddleston v. United States*, supra; *Callanan v. United States*, 364 U.S. 587 (1961).

*Reglas de interpretación vigentes en Puerto Rico*

El Código Penal de Puerto Rico de 1974 contiene disposiciones estatutarias relativas a la interpretación en sus Arts. 6 y 7.([60]) El Art. 6 (33 L.P.R.A. sec. 3021) adoptó lo que en las jurisdicciones civilistas se conoce como la norma de *"interpretación gramatical y declarativa"*. Este tipo de interpretación equivale en las jurisdicciones del *common law* a la regla del recto sentido de los términos del estatuto. El Art. 7 (33 L.P.R.A. sec. 3022) incluye definiciones. La norma allí consignada se conoce como *"interpretación auténtica contextual"*.([61])

El Art. 6 del Código Penal de Puerto Rico, *supra*, dispone lo siguiente:

> *Las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente.*
>
> Las voces usadas en este subtítulo y el Subtítulo 3 en el tiempo presente incluyen también el futuro; las usadas en el género masculino incluyen el femenino y el neutro, salvo los casos en que tal interpretación resultare absurda; el número singular incluye el plural y el plural incluye el singular. (Énfasis suplido.)

El Art. 7 del Código Penal de Puerto Rico, *supra*, dispone lo siguiente:

> *Salvo que otra cosa resulte del contexto, las siguientes palabras y frases contenidas en el presente Código tendrán el significado que se señala a continuación:*
>
> (1) *A sabiendas.— Implica conocimiento personal. No requiere el conocimiento de la ilegalidad del acto u omisión.*
>
> (17) *Ilegalmente.— Todo acto en contravención de alguna ley, reglamento u orden.*
>
> (19) *Malicia o maliciosamente.— Denotan la comisión de un acto dañoso, intencionalmente, sin justa causa o excusa y la consciente naturaleza del mismo.*

---

([60]) 33 L.P.R.A. secs. 3021 y 3022.

([61]) Nevares-Muñiz, *op. cit.*, pág. 130.

(27) *Voluntariamente.— Aplicada a la intención con que se ejecute un acto, o se incurre en una omisión, implica simplemente propósito o voluntad de cometer el acto, o de incurrir en la omisión a que se refiere.* (Énfasis suplido.)

Sobre este tema, nos ilustra la Prof. Dora Nevares-Muñiz de la forma siguiente:

En la exposición de los cánones de interpretación estatutaria en el derecho penal en Puerto Rico, tenemos que considerar en primer lugar las disposiciones apropiadas del Código Penal de 1902, que estuvo vigente hasta 1974. Luego se considerarán los artículos equivalentes o sustitutivos del Código Penal vigente (Arts. 6 y 7). [E]l Tribunal Supremo de Puerto Rico ha incorporado reglas de la jurisdicción civilista junto con los cánones de interpretación prevalecientes en los Estados Unidos.[62]

En *Pueblo v. Arandes de Celis*, 120 D.P.R. 530, 538–539 (1988), expresamos, sobre el tema, lo siguiente:

Reiteradamente hemos decidido que un estatuto penal debe ser interpretado *restrictivamente* en cuanto a lo que desfavorece al acusado y *liberalmente* en cuanto a lo que lo favorezca. *Mari Bras v. Alcaide*, [100 D.P.R. 506 (1972)] supra, pág. 516; *El Pueblo v. Padilla*, 20 D.P.R. 276 (1914). El Art. 6 del Código Penal de 1974, 33 L.P.R.A. sec. 3021, a su vez dispone que "[l]as palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente". Como podrá observarse, *"junto con la doctrina del recto sentido de los términos se adoptó la política de interpretar la ley de la manera más favorable al acusado siempre que lo permitiera el lenguaje de la ley y las circunstancias de su aplicación, así como el espíritu e intención de la misma"....* Nevares-Muñiz, *op. cit.*, pág. 11. (Énfasis suplido y en el original y escolio omitido.)

Recientemente en *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404, 410–411 (1988), expresamos que "[l]os estatutos penales deben interpretarse a la luz de la realidad social de donde surgen y operan. Nuestro deber es interpretar las leyes en el contorno de una situación social y económica actual para resolver controversias humanas de profundas implicaciones per-

---

[62] Íd., págs. 124–125.

sonales para los afectados y para la comunidad en general.... Nunca debemos olvidar que 'el sentido de hoy no es siempre el sentido de mañana' ... [y que l]a interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas ...' [nosotros los jueces] no [podemos estar] ajeno[s] a las transformaciones sociales, científicas y jurídicas. *La ley vive y se desarrolla en ambientes que cambian y evolucionan, y si no queremos estarla reformando de un modo frecuente, preciso es que la adapte [mos], como su propia voluntad permite, a las nuevas necesidades de la época.' ... '[Las leyes hay que interpretarlas] a la luz de las realidades específicas de la sociedad en que opera'.*" (Énfasis suplido y citas omitidas.)

En *Pueblo v. Burgos Torres*, 120 D.P.R. 709, 714–716 (1988), añadimos lo siguiente:

Recientemente en *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988), hicimos acopio de medios interpretativos y nos dimos a la tarea de investigar cuál era el verdadero bien tutelado por el Art. 236 del Código Penal, 33 L.P.R.A. sec. 4432, al resolver la controversia allí planteada. Dijimos en aquella ocasión que "*[a]l interpretar las palabras del Código Penal y resolver la controversia ante este Foro reiteramos como principio cardinal de hermenéutica que al lenguaje de una ley debe dársele la interpretación que valida el propósito que tuvo el legislador al aprobarla*". Expresamos igualmente que "*[e]n buena metodología adjudicativa se debe analizar la ley 'tomando en consideración los fines que persigue ...'* ". *Pacheco v. Vargas, Alcaide*, supra, pág. 409.

. . . . . . . .

La primera obligación del intérprete consiste en examinar el texto legal para apreciar si su sentido es claro. ...

. . . . . . . .

*La claridad y precisión de un estatuto de carácter penal es condición de su validez en nuestro ordenamiento jurídico.* Como aspecto del mismo principio debe negarse cabida a la analogía en materia penal. Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031. Solamente en casos verdaderamente excepcionales y por la repercusión que en Derecho Penal tienen las normas de otras ramas jurídicas afines, pudiera permitirse la aplicación analógica de un precepto para suplir el vacío de esas normas. *Este principio impide en materia penal, y so color de interpretación judicial, que los jueces nos lancemos a labores creadoras.*

*Aclarado este extremo es fácil entender cómo en el campo penal la interpretación realizada por los tratadistas carece de valor obligatorio. Su fuerza reside en la bondad de los argu-*

*mentos atemperados, claro está, por el texto claro de la ley. Naturalmente, tienen particular valor las opiniones de aquellos juristas que influyeron en el legislador positivo, como ocurre en Puerto Rico con los profesores José Pagán Rodríguez, José Miró Cardona, Helen Silving, Manuel López Rey, y otros. D. Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, pág. 41 et seq. De igual forma, ante el sentido claro de la ley, y sobre todo cuando las palabras tienen un significado histórico y jurídico ineludible, la doctrina ofrece en esta área un valioso recurso.* (Énfasis suplido y en el original.)

El uso de un diccionario, como fuente para examinar el significado de una palabra, se reconoce como válido en tanto se presume que el legislador lo conoce y que el significado de la palabra que se recoge en la intención legislativa es el uso común, según se define.[63]

Con relación al significado común y corriente de los términos de la ley, sancionado por el Art. 6 del Código Penal de Puerto Rico, *supra*, expresa la Prof. Dora Nevares-Muñiz lo siguiente:

*... El significado del lenguaje común cambia según el cambio social. Como el lenguaje jurídico se deriva en gran parte del lenguaje común, existe la tendencia a proyectar en aquél el nuevo significado sin prestar atención a si el cambio social que produjo la transformación del significado social del término, tiene alguna pertinencia con respecto a la intención de la legislatura, según expresada en la ley. Al dejar que el significado de la ley sea el que prevalezca al momento de su aplicación, en vez del que prevalecía al momento de promulgar la ley, podría presentarse un problema de aplicación "ex post facto" de una ley, ya que la ley se ha hecho depender de las contingencias del desarrollo linguístico [sic] de la sociedad.*

*Para resolver tal problema debe tomarse en cuenta que, la norma de la interpretación más favorable para el imputado, es parte del debido proceso de la ley y del principio de legalidad. No puede dejarse que la expresión que se haga respecto al significado que se le va a dar a los términos de la ley, en caso de conflicto, sea la que haga el juez al interpretarla luego de realizarse la conducta en controversia. En este caso, tendríamos la situación prohibida por el Tribunal Supremo de los Estados*

---

[63] Nevares-Muñiz, *op. cit.*, pág. 131; *Pueblo v. Arandes de Celis*, supra.

*Unidos en Bouie v. City of Columbia, 378 U.S. 347 (1964); también en Rabe v. Washington, 405 U.S. 313 (1972); y Marks v. United States, 430 U.S. 188 (1977).*

*Otra manera de resolver el problema planteado por Silving, respecto al cambio en el significado de los términos, será aplicando la regla de lenidad, según desarrollada por el Tribunal Supremo federal. En este caso se interpretaría el término, cuyo significado ha cambiado, lenientemente, o sea favoreciendo al acusado. Véase supra, 87 4.5.3.*

Distíngase que en Puerto Rico, el Tribunal Supremo ha indicado que al interpretar las leyes se debe tomar en consideración la evolución natural para las distintas épocas. *Pacheco v. Vargas Alcaide,* 120 D.P.R. 410. Esta opinión cita afirmativamente a Jiménez de Asúa, *La Ley y el Delito,* p. 119, quien indica que el juez no puede estar ajeno a las transformaciones sociales, científicas y jurídicas, por lo que debe estar atento a cómo la ley se desarrolla en unos ambientes que van cambiando. *Como se ha dicho antes, esto podría ser muy peligroso si en el proceso de interpretación se alejara el juzgador de la política pública y de la intención legislativa que se plasmó en la ley al momento de su aprobación, lo cual podría convertir la ley en una de aplicación ex post facto y además violar el principio de legalidad.*

*La presencia en el Código Penal de Puerto Rico de términos que tienen una connotación moral, sin estar previamente definidos, podría prestarse a aplicación discriminatoria ya que se le ha dejado su interpretación a las personas encargadas de aplicar la ley, es decir, policías, fiscales y jueces.* Ejemplos en el Código, de este tipo de términos son los siguientes: buena reputación moral (Art. 101–seducción); proposición obscena (Art. 107); deshonrar, desacreditar, honradez, integridad y buena fama (Art. 118–difamación); lenguaje grosero y paz pública (Art. 260–alteración a la paz). (Énfasis suplido.)[64]

El Art. 7 del Código Penal de Puerto Rico, *supra,* incluye en su texto varias definiciones que se pueden utilizar en la interpretación de las disposiciones de ese cuerpo de legislación penal. Por eso las definiciones que contiene tendrán el significado allí descrito, "salvo que otra cosa resultara del contexto".[65]

---

[64] Nevares-Muñiz, *op. cit.,* págs. 132–133.

[65] Íd., pág. 133.

## III

El Código Penal de Puerto Rico vigente sustenta el principio de que no existe más responsabilidad criminal que aquella que surge de la culpabilidad y divide los delitos en intencionales y negligentes. Art. 14, *supra.* No obstante, es impreciso en cuanto a la aplicación de la intención o negligencia como el estado mental necesario, de ciertos y determinados delitos allí tipificados. Entre ellos, el delito de motín tipificado en el Art. 261 del Código Penal, *supra.* No surgen guías para su aplicación ni de su letra ni del historial legislativo. Veamos.

La Comisión de lo Jurídico Penal de la Cámara de Representantes le solicitó al Departamento de Justicia, al inicio de las vistas públicas celebradas para la consideración del P. de la C. 927, que redactara unos comentarios a cada capítulo, sección y artículo del propuesto, en aquel momento, Código Penal, de suerte que quedara establecido para el récord legislativo la procedencia y los comentarios teóricos y filosóficos sobre todos sus extremos. Después de realizada una extensa búsqueda, no hemos encontrado que el Departamento de Justicia de Puerto Rico hubiera descargado tal misión.

Durante la discusión en el Senado de Puerto Rico del P. del S. 753, titulado "Para Establecer un Código Penal para Puerto Rico y para derogar el Código Penal de Puerto Rico aprobado el 1ro de marzo de 1902", enmendado, las minorías parlamentarias plantearon la falta de especificidad y detalle del informe rendido por la Comisión de lo Jurídico del Senado al Cuerpo. Sobre este aspecto el Debate Legislativo[66] refleja lo siguiente:

SR. MENENDEZ MONROIG: Señor Presidente.
SR. PRESIDENTE: Señor senador Menéndez Monroig.
SR. MENENDEZ MONROIG: Señor Presidente, en relación con este informe, como bien explica el compañero Portavoz de

---

[66] Debate Legislativo sobre el P. del S. Núm. 753, 18 de junio de 1974.

la Mayoría, ya que nosotros no hemos tenido la oportunidad de leerlo, el mismo llegó en la tarde de hoy a nosotros; sin embargo, notamos a vuelo de pájaro, que el distinguido compañero Edwin Bello ha hecho una gran labor en preparar este informe. Vemos que han participado en él una serie extraordinaria de juristas puertorriqueños. Sin embargo, lamentamos, señor Presidente, que dado a la premura, a la rapidez conque se nos ha traído este informe, no estamos en condiciones actualmente de poder votar conscientemente sobre esta medida[,] no tenemos los elementos de juicio necesario para darle nuestra aprobación a esta medida, y le anuncio a nuestros compañeros que esta [s]ala solicita muy respetuosamente, que se le permita abstenerse por las razones que en este momento hemos expresado.

Señor Presidente, quisiera añadir algo más, si me permite. No sólo este informe se nos entrega en estos momentos, sin[o] que el distinguido compañero que es el portavoz nuestro en la Comisión de lo Jurídico Penal, nos informa que el mismo no fue considerado en Comisión Ejecutiva[,] lo que también nos obliga, por dicha razón, a abstenernos a la aprobación del mismo.

SR. HERNANDEZ SANCHEZ: Señor Presidente.

SR. PRESIDENTE: Señor senador Hernández Sánchez.

SR. HERNANDEZ SANCHEZ: Señor Presidente, sin ánimos de entrar en debate, no es nuestra intención y voy a ser muy breve.

Primero, tengo que felicitar al compañero Edwin Bello por el esfuerzo que ha hecho. Lo he visto trabajando día y noche, he estado en la Comisión de lo Jurídico Penal considerando este proyecto. El compañero Edwin Bello ha trabajado con gran sacrificio, con gran responsabilidad, a veces sin comer y eso me consta personalmente.

*Pero, señor Presidente, como estamos tratando con una pieza legislativa que quizás dure cien años, tengo que para la historia,* señor Presidente, tomar una decisión en estos instantes sobre este Código Penal por las razones siguientes:

Primero, porque vine a saber, por la Prensa, de que se había radicado un informe y yo soy miembro de la Minoría, soy Portavoz del Partido Nuevo Progresista en la Comisión de lo Jurídico Penal, me interesé personalmente y de ello puede dar f[e] el compañero Edwin Bello, que está asintiendo afirmativamente con la cabeza en estos instantes, del interés mío, de la participación mía, por esa razón.

Segundo, no he tenido tiempo de leer el informe, salvo lo que leí en la Prensa.

*Tercero, en cuanto a mi opinión personal, como soy abogado postulante en lo criminal, también en lo civil, pero digo en lo*

*criminal porque se trata del Código Penal y he visto informes,
señor Presidente, de piezas legislativas, por ejemplo, del Con-
greso, que son informes detallados donde van artículo por ar-
tículo, yo entiendo, primero, que [a] la Comisión de lo Jurídico
Penal se le debió haber dado un "staff" de personas para que
preparara un informe exhaustivo, completo, sobre cada artí-
culo del Código Penal.*

Y la razón de ello, señor Presidente y compañeros del Se-
nado, es porque ésta es una pieza legislativa que puede durar
cien años, porque el propio informe dispone, que lo empe[c]é a
leer ahorita con el compañero Edwin Bello, *que tuvo la genti-
leza de empezarme a leer unas enmiendas de su propio código
con anotaciones al calce de su puño y letra, que dice que un
Código Penal básicamente tiene que irse transformando en "la
marcha", que es la frase que utiliza el informe.*

*Señor Presidente, yo sé que el compañero Edwin Bello tuvo
que trabajar en los últimos dos días y ello me consta, de prisa,
casi sin dormir, para tener un informe hoy. El compañero Ed-
win Bello, él s[o]lo trabajando en ese informe, él sólo; lo cual es
muy laudable y yo felicito al compañero Edwin Bello por el
sacrificio. Pero yo considero que ese informe, señor Presidente,
debió ser preparado por un "staff" pagado por el Senado de
Puerto Rico, para que fuera más completo, señor Presidente,
más detallado y que el informe incluyera una descripción com-
pleta de todo el articulado del Código Penal, artículo por
artículo.*

*Por esas razones, señor Presidente, desde luego quiero dejar
sentado en el r[é]cord, que yo felicito al compañero Edwin Be-
llo, reconozco su gran trabajo, su conocimiento del derecho pe-
nal, su extraordinaria labor y yo quiero dejar eso en el r[é]cord.
Sin embargo, no puedo, señor Presidente, porque considero el
informe incompleto y por la forma en que ha sido manejado, no
puedo votar a favor de las enmiendas. Por lo tanto, vamos a
abstenernos.*

Cuando venga tal vez de la Cámara algún Código, tal vez
podremos estar aquí tres o cuatro días en Comisión Total es-
tudiando más a fondo el mismo. Gracias, señor Presidente.

SR. BERRIOS MARTINEZ: Señor Presidente.

SR. PRESIDENTE: Señor senador Berríos.

SR. BERRIOS MARTINEZ: Quizás lo que yo diga en este
momento cubra también el aspecto de la aprobación del pro-
yecto, porque lo que diría con respecto a las enmiendas en este
momento, es más o menos lo que diría con respecto al proyecto.

*Este senador no está en condiciones en este momento, por
innumerables razones, algunas de las cuales han mencionado
los compañeros, de entrar en el debate cuidadoso, concienzudo,*

*extenso, que merece este Código Penal. No creo que sea la forma adecuada la que ha sido utilizada, sin entrar en las razones de por qué se utilizó esa forma con respecto a este Proyecto. Un Código Penal afecta la vida de los ciudadanos todos, es un recoger de costumbres, y un sentar buenas pautas para las costumbres del futuro, una extraña mezcla del derecho público y del derecho privado, y por lo tanto, es un aspecto de una delicadeza tremenda que se contiene en este tipo de proyecto mucho m[á]s que otro tipo de proyecto de carácter estrictamente público o estrictamente privado sobre los cuales tenemos que parar constantemente en este Senado. Mas sin embargo, yo quiero decir algo para el récord, para que de forma alguna se entienda mi renuencia a participar en este debate por las razones expresadas en el día de hoy, como en desdoro de la labor del compañero Bello. Muy por el contrario, es una pena que un esfuerzo magnífico, bueno, profundo, con las diversas discrepancias que existen entre sus proyecciones y propuestas y las que yo haría, o las que yo me propondría a hacer en enmiendas si se llevara a cabo el debate de la forma en que yo estuviera dispuesto a participar en él, no empece todo eso, creo que el compañero Bello ha hecho una labor extraordinaria, con una gran responsabilidad, y no quiero que en forma alguna se mal interprete mi posición en el día de hoy como en detrimento de la labor del compañero Bello y la de los otros compañeros de Comisión que llevaron a cabo un trabajo en esta área. El esfuerzo del compañero ha sido grande y es una pena que por razones totalmente ajenas al quehacer legislativo normal y corriente que debe prevalecer en un Cuerpo, ese esfuerzo se vea mancillado por la velocidad con que se tiene que considerar en el día de hoy. Yo espero que por un esfuerzo que los compañeros hagan, tanto el compañero Bello como el compañero Portavoz Marcano, quizás, yo estoy seguro que tendremos la ocasión, no sé cómo, de ver a fondo muchas de las cosas que hoy por la razón de la brevedad del tiempo no se pueden llevar a cabo. Yo estoy seguro que ese fue el propósito del compañero Bello en esta materia. Yo no quiero entrar má s a fondo en las razones por las cuales no entraré en el debate hoy porque creo que es innecesario entrar a fondo en ellas. M[i] felicitación m[á]s calurosa al compañero Bello. Esa felicitación conllevaría quizás un voto positivo después de una serie de enmiendas que este servidor tendría, pero en este momento definitivamente no tengo la capacidad moral, vamos a ponerlo de esa forma, "moral" entre comillas, como para poder ejercitar un voto conciente con respecto a este proyecto. Por esas razones, señor Presidente, yo me abstendré en la votación en el día de hoy, y probablemente no tenga que entrar m[á]s en debate*

*en el día de hoy porque no veo la necesidad de ello a la luz de lo*
*que yo he dicho.*

Muchas gracias, señor Presidente.

SRA. NAZARIO DE FERRER: Señor Presidente.

SR. PRESIDENTE: Señora senadora Nazario de Ferrer.

SRA. NAZARIO DE FERRER: Muy brevemente, señor Presidente, para expresar nuestra abstención.

En primer lugar, considero que el pueblo de Puerto Rico y todos los puertorriqueños conscientes y responsables han estado añorando el momento en que Puerto Rico puede contar con un Código Penal comprensivo, creador, justo y práctico. *Dolorosamente este Código Penal no nos da la oportunidad [de] discutir línea a línea, y concepto a concepto, como merece la gran trascendencia que tiene este documento para el pueblo de Puerto Rico y para todos y cada uno de los puertorriqueños. Lamento que se haya coartado la oportunidad nuestra de poder lograr eso, porque para nosotros, ese Código Penal crea, proyecta y confirma una subcultura jurídica para este pueblo, y eso de por sí es sumamente importante en la vida de este país.*

*El que se ordene[n] los procedimientos en forma justa y en forma real, es algo que hemos estado esperando por largo tiempo, y que a mi modo de ver, dolorosamente, hoy nos tenemos que abstener de su discusión detallada, juiciosa, e inteligente, como es de esperarse. Sin embargo, aquí un compañero señaló que él tiene la esperanza de que cuando este Código regrese de la Cámara, por las razones que sean y no queremos entrar en estos detalles de procedimiento legislativo, tengamos entonces la oportunidad de que antes de que se dé el concurso final y total al mismo, podamos participar m[á]s activamente como requiere y merece el proceso legislativo. Queríamos obviamente tener una participación efectiva y activa dentro de ello y haber podido aportar en parte, nuestra mejor intención, por lo menos juicio aplicado al mismo, pero lamentablemente debido a la forma en que se han procesado las cosas, va a ser aparentemente imposible.* Sin embargo, como los compañeros que me han antecedido en la palabra, creo que los esfuerzos que ha hecho el Presidente de la Comisión, el compañero Edwin Bello, han sido esfuerzos de notable encomio y que nosotros tenemos que agradecer y reconocer por encima de las limitaciones y las dificultades procesales. (Énfasis suplido.)

La función político-criminal del principio de culpabilidad está enmarcada en la limitación del poder estatal. Consideramos que en Puerto Rico todavía no se entiende en toda su magnitud y dimensión la importancia de este principio y las

limitaciones del Estado al desplegar su autoridad y aplicarlo sobre el individuo.[67]

La más controversial de las figuras típicas del principio de culpabilidad adoptada en la Parte General del Código Penal de 1974 es la que el legislador denominó como *"intención"*. El problema reside en las clases de *"intención"*. La *pura, directa, propia* dispuesta por el Art. 15(a), *supra*, y la *presunta, indirecta, impropia*, del Art. 15(b), *supra*.[68] La otra especie de la culpabilidad es la *"negligencia"* regulada por el Art. 16 del Código Penal de Puerto Rico, *supra*.[69]

El Prof. Jaime E. Granados Peña expresa sobre el principio de la culpabilidad lo siguiente:

> Si quisiera seleccionar un aspecto de la teoría del delito en el derecho penal de Puerto Rico, donde el carácter "mixto" se manifieste en su grado máximo, dudo que pudiese encontrar un mejor ejemplo que el de la Culpabilidad.
>
> *En efecto, de clara estructura continental o civil es la ubicación de la culpabilidad, la división en eventos categoriales, su concordancia expresa y subordinada al principio de legalidad y sobre todo, las dos especies o formas principales.*
>
> En cambio, *tiene una evidente influencia anglosajona, en cuanto a la preeminencia de lo subjetivo o mens rea frente a lo normativo, derivada por lo demás de su terminología*, la intromisión de conceptos del derecho probatorio y la necesaria complementación que debe hacerse con una forma u especie casuística de la parte especial, al igual que la proliferación de los elementos subjetivos del tipo.
>
> Con todo, no siguió la tesis originaria del "common law" relativa a las formas de la culpabilidad ni su receptación norteamericana, y, en particular, lo relacionado con la metodología de la atribución, según es desarrollada en el Código Penal Modelo.
>
> *Cualquiera sea su filiación, lo cierto es que resulta inexplicable, que al regular las formas de la culpabilidad, se incurriese en tantos errores, constituyendo su entuerto mayor —tal*

---

[67] J.E. Pérez Díaz, *Ponencia del Secretario de Justicia sobre la Reforma del Código Penal de Puerto Rico, P. del S. 1229*, 62 (Núm. 2) Rev. Jur. U.P.R. 159, 225 (1993).

[68] Íd., pág. 228.

[69] Íd., pág. 230.

*vez de todo el Código Penal de 1974— la especie intencional. En este sentido, además, muy poco ayuda la jurisprudencia relevante, hasta el extremo que desorienta al intérprete más avisado el enfoque de los casos de Castañón Pérez, De Jesús, Rivera Rivera, Flores Betancourt y Ruiz Ramos.*

*Si a lo anterior le agregamos que cuando regula la negligencia —consagrándola como género o especie principal siendo claramente una subcategoría— no sabe uno si dicha formulación original (mezcla de conceptos del derecho italiano, franco-belga y alemán) genera una negligencia residual, o viene a ser, un tipo autónomo. Pero ahí no termina todo, ya que al introducir en la Parte Especial, el tipo concreto de la imprudencia crasa o temeraria, no hay forma de saber si lo hizo al estilo español, anglosajón, o latinoamericano.* (Énfasis suplido y en el original, y escolios omitidos.)[70]

Sobre el mismo tema, expresa la Prof. Dora Nevares-Muñiz lo siguiente:

El primer párrafo del artículo 14 sintetiza el *elemento mental delictivo* en dos formas básicas: *intención o negligencia criminal.* La definición de esas formas se encuentra en los artículos 15 C.P. y 16 C.P., respectivamente. En *Galarza Soto v. Estado Libre Asociado,* 109 DPR 179 (1979), el Tribunal Supremo indica *que entre la intención y la negligencia criminal, al igual que entre el dolo y la culpa civilista, no existe una separación tajante, sino de grados.*

*En el Código existen, además, delitos para los cuales el elemento mental requerido es una forma específica o modalidad de intención,* como por ejemplo la intención de destruir, intención de mutilar, intención de defraudar, maliciosamente, voluntariamente, fraudulentamente, a sabiendas, entre otros. Asimismo, la negligencia puede ser simple o crasa y temeraria.

*NEVARES-MUÑIZ, Derecho Penal, 156, (ed. 1983), 184 (eds. 1994, 1995), 192 (ed. 2000), expresa que el denominador común de los elementos de la culpabilidad en Puerto Rico es una gran falta de sistematización. Lo propio hubiera sido que al redactar el Código de 1974 se formulara consistentemente el elemento mental de los delitos tipo bajo las formas de intención o negligencia.*

Por otra parte, si bien el Código Penal define algunos de los elementos subjetivos del tipo en su artículo 7, *no dispuso re-*

(70) J.E. Granados Peña, *Estudio comparativo de la culpabilidad en el sistema penal de Puerto Rico (Faz Positiva),* 61 (Núm. 1) Rev. Jur. U.P.R. 71, 91–94 (1992).

*glas o esquema alguno para utilizar en la consideración de los mismos, como por ejemplo se hizo en el Código Penal Modelo, 87 2.02.* Incluso, *en ocasiones es necesario acudir a la jurisprudencia para definir alguno de los elementos mentales que aparecen en el tipo delictivo.* Este es el caso de los elementos de premeditación y deliberación, típicos del delito de asesinato. Este hecho se reconoce por el Tribunal Supremo en *Pueblo v. Morales Roque*, 113 DPR 876, 879 (1983) al expresar que "pocas zonas están revestidas de tanta dificultad como la definición de la mens *rea requerida para el caso de cualquier delito en particular".* (Énfasis suplido.)[71]

Sobre la imprecisión de nuestro Código Penal expresó, además, la Prof. Dora Nevares-Muñiz lo siguiente:

*El Código tampoco es claro en cuanto al uso preciso del lenguaje, requisito reconocido en el principio de legalidad.* En las secciones que siguen, particularmente al evaluar críticamente los elementos constitutivos de los delitos, se proveerán ejemplos específicos de esta situación. Valga por ahora mencionar que *a través del Código se utilizan diferentes tiempos gramaticales en una misma conducta delictiva. A veces el tipo legal comienza indicando la pena a imponer y luego se describe la conducta, mientras que en otros casos es al revés. A través del catálogo de delitos, se usan distintos términos para referirse a lo mismo.* Así por ejemplo, se habla de "toda persona", y "aquél que"; de que "se impondrá pena de", o "será sancionado con pena de". Además de esto, hay varias palabras y frases que son gramatical u ortográficamente incorrectas.

*En cuanto a las definiciones, se han omitido definiciones de gran importancia como es la definición de causalidad, requisito fundamental para la configuración de varios delitos del Código Penal. Aunque se proveen adecuadas definiciones de los elementos mentales de intención y negligencia, al tipificar los delitos se hace referencia a otros estados mentales como por ejemplo premeditación, deliberación, intención de defraudar, a sabiendas, malicia, voluntariamente, etc.* (Énfasis suplido.)[72]

---

[71] D. Nevares-Muñiz, *Código penal de Puerto Rico: revisado y comentado*, 7ma ed. rev., Hato Rey, Ed. Inst. Desarrollo del Derecho, 2001, pág. 27.

[72] D. Nevares-Muñiz, *Análisis crítico del Código Penal de Puerto Rico*, XXIV (Núm. 1) Rev. Jur. U.I.A. 5, 17 (1989).

En *Pueblo v. Flores Betancourt*, 124 D.P.R. 867–876, 878 (1989),([73]) expresamos lo siguiente:

> *Nuestro Código Penal no tiene reglas para determinar qué elemento mental es requerido para cada delito. D. Nevares-Muñiz, Derecho Penal Puertorriqueño: Parte General, Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, Sec. 5.6.3, pág. 156. Para determinar si un delito es de intención o de negligencia hay que acudir a su tipificación en la parte especial del código. Términos tales como "a sabiendas", "fraudulentamente", "maliciosamente", "voluntariamente", etc. denotan delitos intencionales o dolosos.* Íd.
>
> *Además de necesitar esta intención general, algunos delitos requieren cierta intención específica para quedar constituidos....*
>
> . . . . . . . .
>
> Finalmente, debemos recordar *que la intención es una cuestión de hecho* a ser evaluada y determinada por el Jurado o el juez en los casos de juicio por tribunal de derecho. Véase *Pueblo v. Bonilla Ortiz*, 123 D.P.R. 434 (1989). Sin embargo, *la intención es un elemento mental*, por lo que en ausencia de manifestaciones del imputado que reflejen su estado anímico, el Ministerio Público sólo puede establecerla con prueba de todas las circunstancias relacionadas con la comisión del delito y de la conducta del imputado. Art. 14 del Código Penal, *supra*. (Énfasis suplido y en el original.)

En *Pueblo v. Ruiz Ramos*, 125 D.P.R. 365, 383–388 (1990),([74]) expresamos lo siguiente:

> Para poder determinar si existe responsabilidad penal de una persona por un acto delictivo hay que acudir al Art. 14 del Código Penal, 33 L.P.R.A. sec. 3061, *que establece como formas de culpabilidad la intención o negligencia criminal. La presencia de intención o negligencia criminal completa la configuración de los elementos constitutivos del delito.* La ausencia de éstas convierte la muerte en un accidente desgraciado.
>
> En el *common law*, la responsabilidad criminal de una persona se configura cuando concurren el *actus reus* (la realización de la actividad delictiva) y el *mens rea (el elemento men-*

---

([73]) Opinión del Tribunal emitida por el Juez Asociado Señor Hernández Denton.

([74]) Opinión del Tribunal emitida por el Juez Asociado Señor Hernández Denton.

*tal, que se puede manifestar como intención, conocimiento, imprudencia o negligencia). "Es difícil generalizar sobre el elemento mental de un delito; ya que varía de delito a delito*, y puede incluso variar en un mismo delito de un elemento físico a otro.... Los tipos principales de culpabilidad mental son (1) *intención,* (2) *conocimiento,* (3) *imprudencia,* y (4) *negligencia."* W.R. LaFave y A.W. Scott, *Handbook on Criminal Law,* citado en D. Nevares-Muñiz, *Derecho Penal Puertorriqueño: Parte General,* Hato Rey, Ed. Inst. Desarrollo del Derecho, 1983, pág. 154.

Tradicionalmente, *el conocimiento* ha formado parte de la definición de *"intención".* Aquel que conoce las consecuencias de sus actos y las desea, o que pudo preverlas aun cuando no las desea, tiene la intención criminal requerida. El hecho de que no exista una distinción clara y tajante entre *intención* y *conocimiento* no tiene consecuencias prácticas mayores, porque "usualmente hay una buena razón para imponer responsabilidad si el acusado deseaba el resultado o solamente lo había previsto". W.R. LaFave y A.W. Scott, *Handbook on Criminal Law,* Minnesota, West Publishing Co., 1972, pág. 197.

En el *common law, la negligencia* requerida para responsabilizar penalmente a una persona es mayor que aquella que se requiere en una acción en daños y perjuicios. Usualmente se exige un mayor riesgo de causar daño o que se conozca o se pudiese prever el riesgo causado. *La negligencia se ha definido como una desviación crasa del estándar de cuidado que un hombre prudente y razonable ejercería si se encontrara en la situación del acusado.* R.M. Perkins y R.N. Boyce, *Criminal Law,* 3ra ed., Nueva York, The Foundation Press, 1982, pág. 848.

La *imprudencia* se reserva para aquellos casos donde, además de existir un mayor riesgo de causar daño, el actor tenía la obligación de haberlo previsto. En estos casos utilizamos *un estándar subjetivo,* el actor conocía el resultado de su acción o "sabía que no conocía si la acción era o no riesgosa y de hecho lo era". LaFave y Scott, *op. cit.,* pág. 213. Sin embargo, *la imprudencia y la negligencia* tienen algo en común. "Cada una requiere un tipo de conducta que representa una desviación crasa del estándar de cuidado de un hombre prudente y razonable." Perkins y Boyce, *op. cit.,* pág. 850.

Por otro lado, en la tradición civilista las *formas de culpabilidad* se dividen en *el dolo* y *la culpa. El dolo, la forma de culpabilidad* más grave, a su vez se clasifica en *dolo eventual* y en *dolo directo.*

El *dolo es eventual* "cuando el agente se representa como un posible resultado dañoso y no obstante tal representación no

renuncia a la ejecución del hecho, aceptando sus consecuencias". E. Cuello Calón, *Derecho Penal*, 18va ed., Barcelona, Ed. Bosch, 1980, T. 1, Vol. 1, pág. 444.

En *el dolo directo* "existe la representación que eleva a un deseo expreso de efectuar el acto, queriendo la producción de los resultados. En este caso se configura una voluntad totalmente comprometida con los actos delictivos realizados". Nevares-Muñiz, *op. cit.*, pág. 144.

*La culpa* es aquella desviación de una conducta esperada del hombre prudente y razonable en las circunstancias particulares del caso. "El derecho le sanciona la *ligereza, descuido, pereza*, o *torpeza* con la cual actúa el sujeto en el discurrir de sus actividades normales." Nevares-Muñiz, *op. cit.*, pág. 146. Cuello Calón, *op. cit.*, pág. 466, establece que existe culpa "cuando obrando sin intención y sin la debida diligencia se causa un resultado dañoso, previsible y penado por ley".

*Para que exista culpa* es necesario: (1) que exista una acción *no intencional y voluntaria*, (2) que la persona haya realizado *el acto sin la prudencia requerida al hombre prudente y razonable* en situaciones similares, y (3) que el resultado dañoso *haya podido ser previsto* por la persona que actúa. Nevares-Muñiz, *op. cit.*, págs. 146–147; Cuello Calón, *op. cit.*, págs. 466–467.

Sin embargo, *la culpa no se da en términos tan abstractos, sino que se manifiesta en cuatro (4) modalidades: imprudencia, negligencia, impericia e inobservancia de reglamentos y leyes.*

Se ha definido la *imprudencia* como la realización de un acto que no corresponde a la conducta que exhibiría *el hombre prudente y razonable*. "La *imprudencia* supone una *actividad positiva*, se refiere al *obrar irreflexiblemente sin precaución ni cautela*." Cuello Calón, *op. cit.*, pág. 474.

En contraste, *la negligencia* supone *un no hacer*; equivale a *descuido*. Es la omisión sin la atención requerida en casos similares. Al condenar a una persona bajo la modalidad de *omisión negligente* se le castiga *"por un tolerar o un no actuar en ocasiones en que está obligado por la ley a actuar si quiere ser considerado por el ordenamiento como una persona razonable, madura y responsable de sus actos"*. Nevares-Muñiz, *op. cit.*, pág. 148.

La sociedad ha establecido *una presunción* respecto a la habilidad que tienen algunos profesionales que han recibido adiestramiento especializado al efecto. Si no se realiza el oficio, profesión u ocupación con *la debida prudencia* se estará bajo *la modalidad de impericia*. "Es necesario señalar que no debe confundirse la *impericia* con las modalidades anterior-

mente descritas de *la imprudencia* y *la negligencia*: el *acto imperito* puede involucrar tanto *acciones negligentes* como *acciones imprudentes*, si se mira desde un estricto punto de vista, como se denota claramente del ejemplo de un médico que acepta hacer una operación para la cual no está preparado. Lo que *distingue a la impericia* de *las modalidades arriba mencionadas* es que se produce un *acto culposo bajo la forma de un oficio, profesión u ocupación* para la cual *se presupone preparado al individuo"*. Nevares-Muñiz, *op. cit.*, pág. 149. *Pueblo v. Rivera Rivera*, 123 D.P.R. 739 (1989).

Otra *modalidad* de *la culpa* es aquella conocida como *incumplimiento de reglamentos*. Generalmente se ve en los casos *de reglamentos* que tienden a *la seguridad* y *a la normal convivencia de las personas*. Cuello Calón, *op. cit.*, pág. 473.

Hemos visto que aun con orígenes distintos, tanto *el derecho anglosajón* como *el derecho civil*, en su desarrollo contemporáneo, han establecido la diferencia existente entre *la negligencia* requerida para lograr *una convicción penal* y aquella necesaria para *una acción de daños y perjuicios*. Se ha reconocido que *el grado de negligencia requerida en casos de naturaleza penal es mayor que el exigido cuando se trata de acciones civiles*. Perkins y Boyce, *op. cit.*, págs. 840–849; J. Santos Briz, *La Responsabilidad Civil*, 3ra ed., Madrid, Ed. Montecorvo, 1981, págs. 80–87; S. Soler, *Derecho Penal Argentino*, Buenos Aires, Tipográfica Editora Argentina, 1956, T. II, págs. 138–142.

. . . . . . . .

Nuestra definición de *"intención"* proviene del "common law". Como bien señala la profesora Nevares-Muñiz, "[p]ara explicar la *intención general* descrita en el artículo 15, C.P., *no puede acudirse a la doctrina civilista, sino a la del common law, donde tiene su origen* y en particular al principio de versari in re illícita, según evolucionó en la doctrina de que toda persona *es responsable por las consecuencias naturales y probables de sus actos"*. Nevares-Muñiz, *op. cit.*, pág. 158.

. . . . . . . .

*... hemos adoptado las categorías de culpa* delineadas *por la tradición civilista*. Nuestro Art. 16 del Código Penal *establece la negligencia criminal* cuando se *"ha producido un resultado delictuoso sin quererlo, por imprudencia o descuido, o falta de circunspección o impericia o por inobservancia de la ley"*. 33 L.P.R.A. sec. 3063. De manera que *"la negligencia puertorriqueña con sus modalidades de imprudencia[,] descuido, impericia, falta de atención o inobservancia de leyes y reglamentos equivale a la culpa civilista"*. Nevares-Muñiz, *op. cit.*, pág. 149.

Sin embargo, en nuestro derecho penal se requiere un grado mayor de negligencia para sostener una convicción que la necesaria bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141. *Pueblo v. Rivera Rivera*, supra; *Pueblo v. Rodríguez*, 47 D.P.R. 600 (1934); *Pueblo v. Rodríguez*, 70 D.P.R. 23, 29 (1949); *Pueblo v. López*, 77 D.P.R. 607 (1954). Véase, también, D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 31. (Énfasis suplido y en el original, y escolio omitido.)

La responsabilidad criminal de una persona se configura cuando concurren la realización de la actividad delictiva (*actus reus*) y aquel elemento mental (*mens rea*), ingrediente fundamental este último del principio de culpabilidad. La intervención del Estado con un individuo está limitada en la *aprobación* y *aplicación* de la ley penal por *los principios inseparables de legalidad y de culpabilidad.*([75]) Tales principios son parte de los ideales adoptados por la sociedad puertorriqueña como parte de nuestros valores democráticos, relacionados directamente con el derecho constitucional a un debido proceso de ley. Al aprobar legislación, el Estado tiene que ajustarse al principio de legalidad y especificar, o cuando menos establecer, guías con estándares explícitos en cuanto al *actus reus* y al *mens rea*. De otra forma, existe un potencial de arbitrariedad cuando el Estado le aplica a un individuo un estatuto penal de naturaleza imprecisa.

De la letra del Art. 261, *supra*, ni del historial legislativo surge la intención del legislador sobre cuál de las modalidades del principio de culpabilidad (*mens rea*) es aplicable al delito de motín. No expresa que la conducta allí tipificada como delito tiene que ejecutarse en forma "*voluntaria*", "*intencional*", "*maliciosa*", "*a sabiendas*" o "*negligentemente*". El Ministerio Público sostuvo ante el Tribunal de Primera Instancia que cuando la tipificación del delito, en este caso el de motín, no especifica qué grado de culpabilidad es elemento para su comisión, aplica el de

---

([75]) *Colautti v. Franklin*, 439 U.S. 379 (1979); *City of Chicago v. Morales*, supra.

*intención general* en su modalidad de *"consecuencia probable"* o el de *negligencia*. Sostuvo que, a tenor con el espíritu de la ley, para que fuera aplicable el elemento de *intención específica* al delito de motín era necesario que el legislador incluyera lenguaje en su tipificación, que dentro de las reglas de interpretación dispuestas en los Arts. 6 y 7, *supra*, pudieran apuntar a tal conclusión. Expresó que como no lo hizo, la intención del legislador fue establecer que el motín se puede cometer aun cuando los imputados no deseen ni quieran perturbar la tranquilidad pública. Basta con que esa sea la *consecuencia probable* o el resultado obtenido por la *imprudencia o descuido, falta de circunspección* o *impericia*, o *por la inobservancia de la ley*, al participar activa y directamente en el uso de *fuerza* o *violencia*, o, en la alternativa, por su *ayuda, instigación* y *cooperación* con otros de los imputados en su participación activa y directa en el ejercicio de *fuerza y violencia*.

El Tribunal de Primera Instancia concluyó que el aquí peticionario era consciente de que su conducta por *"lo menos podría tener como consecuencia probable, la perturbación de la paz pública, que podría culminar en el delito de motín"*. (Énfasis suplido.) El Tribunal de Circuito de Apelaciones concluyó que el delito de motín no incluye como elemento la intención específica de perturbar la tranquilidad pública. Determinó *que es suficiente la intención general* en cualquiera de sus dos modalidades o, *en la alternativa, la negligencia como elemento de ese delito*.

Resuelta por el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones la controversia entre las partes, sobre cuáles son los elementos del delito de motín tipificado en el Art. 261 del Código Penal, *supra*, es función de esta Curia pasar juicio, como cuestión de umbral, sobre la aplicación de esos dos foros judiciales de los cánones de interpretación judicial aplicables al asunto.

En el proceso de armonizar la estricta legalidad del derecho positivo punitivo con la imprescindible interpreta-

ción teleológica del delito de motín, no encontramos, dentro del espíritu de la ley, que fuera el propósito específico del legislador adscribirle a ese delito la *intención general* en *las modalidades de "consecuencia natural o probable"* o, *en la alternativa, negligencia* al producir un resultado delictuoso *sin quererlo* "por *imprudencia o descuido, o falta de circunspección o impericia, o por inobservancia de la ley"*. Tampoco surge del espíritu de la ley que fuera el propósito del legislador adscribirle la *intención específica de perturbar la tranquilidad pública,* por haber sido tal el resultado *previsto* y *querido por la persona* como consecuencia de su conducta. En una situación como la presente, la normativa vigente formulada por el Tribunal Supremo de Estados Unidos —por imperativo del derecho a un debido proceso de ley garantizado por la Constitución de Estados Unidos— nos brinda la solución. Veamos.

¿Es impreciso el delito de motín en cuanto al estado mental aplicable al ámbito en particular que tipifica? A base del examen de su letra y el historial legislativo que hemos examinado, creemos que así es.

La regla de lenidad (*rule of lenity*) no se puede aplicar a menos que la ambigüedad del estatuto penal sea genuina y *no se pueda resolver de la faz de la ley ni del examen del historial legislativo*. Esta regla se fundamenta en la garantía constitucional a un debido proceso de ley de una persona con quien el Estado interviene al aplicarle un estatuto penal. Ninguna persona puede ser obligada a especular sobre si determinada conducta está prohibida o no, bajo la inminencia de una acusación, sin que se le especifique en el estatuto penal que se le pretende aplicar, la naturaleza de la actividad delictiva (*actus reus*) y el estado mental (*mens rea*) aplicable, ambos ingredientes fundamentales del principio de legalidad. Este asunto adquiere mayor relevancia e importancia cuando el estatuto penal pretende restringir o reglamentar el derecho constitucional a la libertad de expresión. Se le tiene que garantizar a

esa persona que la Rama Legislativa utilizará la precisión adecuada al tipificar una conducta como delito, demarcando específicamente el *actus reus* y el *mens rea*.

En el caso ante nos, tenemos la interrogante sobre cuál de los grados de culpa que establece el Código Penal aplica al delito de motín. Como existe duda sobre qué estado mental aplica por imperativo del derecho constitucional a un debido proceso de ley del aquí peticionario, tendría que resolverse tal asunto en forma favorable a éste.

En *Pueblo v. Ríos Dávila*, 143 D.P.R. 687, 696–697 (1997), expresamos lo siguiente:

> ... *Todas las leyes, incluso las más claras, requieren de algún grado de interpretación. Pueblo v. Sierra Rodríguez*, 137 D.P.R. 903 (1995). En cuanto a esa teoría, *es fundamental recordar que al lenguaje de una ley debe dársele la interpretación que valide el propósito del legislador,* conscientes siempre de sus consecuencias. *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404,409 (1988). Por esta razón, "[t]enemos el deber de hacer que el derecho sirva propósitos útiles y evitar una interpretación tan literal que lleve a resultados absurdos". (Énfasis suplido.) Íd.
>
> *En el contexto de las leyes penales, el debido proceso de ley exige, como condición para su validez, que los estatutos sean claros y precisos. Pueblo v. Mantilla, 71 D.P.R. 36 (1950). Conforme al principio de legalidad, los estatutos penales deben ser interpretados de forma restrictiva en cuanto a lo que desfavorece al acusado, y liberal en lo que le favorece. Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031; Pueblo v. Rodríguez Jiménez, 128 D.P.R. 114 (1991).*
>
> *Sin embargo, esto no quiere decir que a la letra de un estatuto deba dársele su significado más restrictivo, o hacer caso omiso a la evidente intención del legislador. Pueblo v. Sierra Rodríguez,* supra; *Pacheco v. Vargas, Alcaide,* supra, pág. 410; *Pueblo v. Mantilla,* supra, pág. 44. No debemos perder de vista que la ley penal *"[n]o es, [ni tampoco será nunca] un sistema completo y sin lagunas de modo que con el simple procedimiento lógico, basado en los preceptos legales escritos, se puedan resolver todas las cuestiones".* (Escolio omitido.) *Pueblo v. Tribl. Superior*, 81 D.P.R. 763, 788 (1960).

A base de lo antes expuesto, y aplicada la regla de lenidad al caso de autos, la conclusión ineludible es que a la actividad delictiva (*actus reus*) establecida en el Art. 261

del Código Penal, *supra*, habría que adscribirle el estado mental (*mens rea*) de intención específica considerada en el Art. 15(a), *supra*, por ser el más que exige del Ministerio Público para sostenerlo y, a la vez, el más leniente o favorable al aquí peticionario.

Sobre el elemento de *"fuerza o violencia"*, que es parte de la actividad delictiva (*actus reus*) tipificada en el delito de motín, las partes sostienen una intensa controversia. El Ministerio Público expresa que tal elemento del delito no se refiere a actos específicos de esfuerzo físico contra los empleados de la Oficina de la Procuraduría de la Mujer ni contra la propiedad de éstos o de esa entidad gubernamental. Afirma que basta con que la conducta desplegada cause *"terror o alarma"* en una persona promedio. El aquí peticionario es del criterio que tal elemento requiere *esfuerzo físico* y que así afirmativamente fue alegado por el Ministerio Público contra el aquí peticionario, primero en la denuncia y posteriormente en la acusación.

Regularmente recurrimos al diccionario como fuente confiable para determinar el significado de una palabra, presumiendo que el legislador la conoce.[76] El Art. 6 del Código Penal, *supra*, que adoptó la norma de *"interpretación gramatical declarativa"*, dispone que *"las palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente"*. La *interpretación gramatical* se refiere a que el juez examine el *significado gramatical de las palabras y la sintaxis de las oraciones* en la ley. Cuando se trata de *términos técnicos*, éstos se deben interpretar dentro del contexto en que aparecen en la ley; si se trata de *vocablos extra jurídicos* que pertenecen al *lenguaje común*, se les dará *el significado que les concede el uso corriente*. Si de ese análisis surge una *interpretación clara y aceptable*, ahí concluye el ejercicio de interpretación. La *interpretación declarativa* se hace cuando *el juez aplica la ley* al establecer una *corresponden-*

---

[76] *Pueblo v. Arandes de Celis*, supra, pág. 539.

*cia exacta entre las palabras y el espíritu de la ley.* Este tipo de interpretación puede ser, a su vez, *restrictiva* o *extensiva.* La *restrictiva* consiste en *limitarse a entender las palabras como la única voluntad del legislador.* La *extensiva* ocurre cuando *la letra de la ley no expresa claramente la voluntad del legislador.*[77] Como parte de *la interpretación declarativa extensiva* está *el principio de que los estatutos penales se deben interpretar restrictivamente en cuanto a lo que desfavorezca al acusado, y liberalmente en cuanto a lo que le favorezca.*[78]

La decimonovena edición del *Diccionario de la Lengua Española* publicado por la Real Academia Española en 1970, *vigente para la fecha de la aprobación de nuestro Código Penal el 22 de julio de 1974,* define *"fuerza"* y *"violencia"* de la forma siguiente:

> *fuerza— Vigor, robustez y capacidad para mover una cosa* que *tenga peso o haga resistencia;* como para levantar una piedra, tirar una barra, etc.
> *violencia—* Cüalidad de *violento.* Acción y efecto de *violentar o violentarse. Acción violenta* o contra el natural modo de proceder.
> *violentar—* Aplicar *medios violentos a cosas o personas para vencer su resistencia.* Entrar en una casa u *otra parte contra la voluntad de su dueño.*
> *violento— Que está fuera* de su *natural estado, situación o modo.* Que obra por *ímpetu y fuerza.*
> *violentamente—* De *manera violenta.* (Énfasis suplido.) *Diccionario de la Lengua Española,* 9na ed., Madrid, Ed. Espasa Calpe, 1970, págs. 640 y 1344–1345.

El *Diccionario de la Lengua Española,* publicado por la Real Academia Española en 1992, vigésima primera edición, *vigente actualmente,* define *"fuerza"* y *"violencia"* de la forma siguiente:

> *fuerza— Vigor, robustez y capacidad para mover una cosa* que

---

[77] *Pueblo v. Sierra Rodríguez,* 137 D.P.R. 903, 906–908 (1995).

[78] Íd., págs. 908–909; *Pueblo v. Arandes de Celis,* supra; *Mari Bras v. Alcaide,* 100 D.P.R. 506, 516 (1972).

*tenga peso* o *haga resistencia*; como para levantar una piedra, tirar una barra, etc. *Aplicación del poder físico* o moral.

*violencia*— Cualidad de *violento*. Acción y efecto de *violentar* o *violentarse*. Acción *violenta* o contra el natural modo de proceder.

*violentar*— Aplicar *medios violentos* a *cosas* o *personas* para *vencer su resistencia*. Entrar en una casa u *otra parte contra la voluntad de su dueño*.

*violento*— *Que está fuera de su natural estado, situación o modo. Que obra con ímpetu y fuerza.* Que se hace *bruscamente, con ímpetu e intensidad extraordinarias.*

*violentamente*— De *manera violenta*. (Énfasis suplido.) *Diccionario de la Lengua Española*, 21ra ed., Madrid, Ed. Espasa Calpe, 1992, págs. 707 y 1485.

En *Pueblo v. Sierra Rodríguez*, supra, interpretamos la extensión de la palabra "obra", según ésta es utilizada dentro del contexto del Art. 188A del Código Penal de Puerto Rico.[79] Ese artículo fue añadido a nuestro Código Penal mediante la Ley Núm. 63 de 5 de julio de 1988. Existe un historial legislativo con relación a ese estatuto que nos permitió auscultar y deducir claramente la intención y el propósito específico del legislador. *No obstante*, el Juez Asociado Señor Fuster Berlingeri puntualizó lo siguiente sobre este asunto en su opinión de conformidad:

> *El precepto de que los estatutos penales deben ser interpretados de forma restrictiva en cuanto a lo que desfavorezca al acusado no es un mero canon de hermenéutica. Se trata más bien de una importante regla de naturaleza normativa, que debe acatarse con rigurosa fidelidad, porque se origina en el más fundamental principio del derecho penal y se apoya en mandatos constitucionales de la mayor jerarquía.*
>
> *El precepto aludido surge en esencia del principio de la legalidad, sobre el cual se erige nuestro ordenamiento jurídico penal.* Art. 8 del Código Penal, 33 L.P.R.A. sec. 3031. La *interpretación restrictiva* del alcance de los estatutos penales es un corolario del axioma básico contenido de la antigua máxima *nulla poena sine lege. Meléndez v. Tribunal Superior*, 90 D.P.R. 656 (1964). *Es también un corolario del mandato constitucional sobre el debido proceso de ley en el ámbito penal, conforme*

[79] 33 L.P.R.A. sec. 4306a.

*al cual no se puede hacer responsable criminalmente a ninguna persona por una conducta que no podía entender razonablemente que estuviese proscrita. Pueblo v. Tribunal Superior, 81 D.P.R. 763 (1960). Por estas razones, el precepto en cuestión debe tomarse muy en serio por todos los foros judiciales.* (Énfasis suplido y en el original.) *Pueblo v. Sierra Rodríguez,* supra, pág. 915.

La posición del Ministerio Público es que no es necesario demostrar *actos específicos* de *esfuerzo físico* para demostrar el elemento de *"fuerza"* o *"violencia"*, sino que bastaría que la *conducta desplegada* cause *"temor o alarma"* en una *persona promedio.* La edición décimonovena del *Diccionario de la Lengua Española* de 1974, año en que se aprobó el actual Código Penal, define *"fuerza"* como *la capacidad del robusto y vigoroso para hacer resistencia contra algo o alguien.* No obstante, la edición vigésima primera del *Diccionario de la Lengua Española* de 1992 define *"fuerza"* como *la capacidad del robusto y vigoroso para hacer resistencia contra algo o alguien y la aplicación de poder físico para lograrlo.*

Si aplicáramos la *norma de interpretación gramatical* a los términos *"fuerza"* o *"violencia"*, *"violentar"*, *"violento"*, *"violentamente"*, *vocablos extra jurídicos* que pertenecen al *lenguaje común en Puerto Rico*, tendríamos que imprimirle el alcance de la definición que aparece en la vigésima primera edición del *Diccionario de la Lengua Española.* De otra forma, actuaríamos en forma contraria a nuestras expresiones en *Pueblo v. Arandes de Celis,* supra, a los efectos de que es nuestro deber interpretar las leyes en el contorno de una *situación social actual* para resolver *controversias humanas de profundas implicaciones personales para los afectados y la comunidad en general.* Allí puntualizamos que *"[n]unca debemos olvidar que 'el sentido de hoy no es siempre el sentido de mañana' ".* Íd., pág. 539. Añadimos al respecto que *"[l]a interpretación judicial tiene por su naturaleza una evolución natural para las distintas épocas".* (Énfasis suplido.) Íd.

Sobre este aspecto, comenta la Prof. Dora Nevares-Muñiz, *en un análisis crítico de la norma jurisprudencial antes expuesta*, que cuando se permite que *el significado de la ley penal prevalezca al momento de su aplicación, en vez del que prevalecía al momento de promulgar la ley, se podría presentar un problema de aplicación "ex post facto" de una ley, ya que la ley se ha hecho depender de las contingencias del desarrollo lingüístico de la sociedad.* Este análisis parte de la premisa de que *el significado de la ley penal a aplicarse* sobre el fundamento *del que es prevaleciente* al momento de su aplicación sea *más gravoso o perjudicial al acusado que el significado de la ley penal al momento de promulgarse.* Ese no es el caso ante nos. Por el contrario, *el significado actual* de los términos *"fuerza"*, *"violencia"*, *"violentar"*, *"violento"* y *"violentamente"*, le son más favorables al peticionario que *los que prevalecían al momento de promulgarse el Código Penal de Puerto Rico en 1974.* El significado actual del término *"fuerza"* presupone *la aplicación del poder físico del robusto y vigoroso con capacidad para hacer resistencia sobre algo o alguien.* Por lo tanto, no es suficiente que la conducta observada por el aquí peticionario cause *"temor o alarma"* sin que se le demuestre el ejercicio de *"fuerza"* o *"violencia"* antes indicado.

En conjunto con la doctrina del *recto sentido de los términos, adoptamos la política de interpretar la ley penal de la manera más favorable al acusado, siempre que lo permitiera el lenguaje del estatuto y las circunstancias de su aplicación, así como su espíritu e intención.*[80] La norma de *la interpretación más favorable para el imputado* es parte del *debido proceso de ley* y *del principio de legalidad. No podemos permitir* que *el significado que se le va a dar al lenguaje de un estatuto penal, en caso de conflicto, sea el que realice el juez al interpretarla, luego de incurrida la conducta en controversia.* En ese caso, nos ilustra la Prof. Dora Nevares-Muñiz, estaríamos frente a la situación que pro-

---

[80] *Pueblo v. Arandes de Celis*, supra.

híbe el Tribunal Supremo de Estados Unidos en *Bouie v. City of Columbia*, 378 U.S. 347 (1964); *Rabe v. Washington*, 405 U.S. 313 (1972), y *Marks v. United States*, 430 U.S. 188 (1977).[81]

El resultado de aplicar *la norma de interpretación gramatical* es que a los términos que utiliza el Art. 261 del Código Penal, *supra*, de *"fuerza"* o *"violencia"* para describir un elemento de *la actividad o conducta delictiva (actus reus)* tipificada tiene que impartírsele *el significado más favorable al aquí peticionario*, o sea, que *tendría que demostrar el Ministerio Público*, en la modalidad de *autor inmediato o mediato*, que *"una persona robusta y vigorosa con capacidad para mover algo o alguien" que le haga resistencia, aplicó poder físico para lograrlo.*

Si aplicáramos *la norma de interpretación declarativa* y evaluamos *la correspondencia entre la letra del estatuto y su espíritu*, llegamos a un resultado similar. No surge del historial legislativo que hemos evaluado la intención del legislador en cuanto a la aplicación al delito ante nos, de un grado de culpa específico. Por lo tanto, es imperativo imprimirle una *interpretación declarativa de naturaleza extensiva*. La *letra de la ley tampoco expresa claramente la voluntad del legislador* sobre tal extremo, por lo que prevalece la aplicación de la *regla de lenidad (rule of lenity)*, por *imperativo de la garantía constitucional del aquí peticionario a un debido proceso de ley. Tiene que impartírsele al estatuto la interpretación más leniente o más favorable* al peticionario.[82]

Las partes sostienen ante nos la controversia sobre el elemento de la actividad delictiva (*actus reus*) tipificada, constitutivo de que la conducta allí estipulada la tienen que realizar "dos o más personas, obrando juntas y sin autoridad

---

[81] Nevares-Muñiz, *Derecho penal puertorriqueño: parte general, op. cit.*, pág. 132.

[82] Nevares-Muñiz, *Derecho penal puertorriqueño: parte general, op. cit.*, pág. 132.

de ley". El Ministerio Público alega que tal lenguaje no implica que el Estado tenga que demostrar el "designio común de dos o más personas" para cometer el delito de motín. De otra parte, el peticionario alega que para cometerse tal delito tiene que demostrarse que dos o más personas incurrieron en la conducta allí tipificada como parte de un "designio común". Sobre tal extremo, nos ilustra la Prof. Dora Nevares-Muñiz en su análisis editorial sobre el delito de motín lo siguiente:

Cuando la perturbación a la tranquilidad pública se lleva a cabo por dos o más personas actuando juntas y sin autoridad de ley, estamos ante el delito de motín. La perturbación a la tranquilidad pública se puede realizar utilizando fuerza o violencia, o amenazando con emplear tal fuerza o violencia, acompañada la amenaza de la aptitud para realizarla.

*El Tribunal Supremo ha indicado que no constituye elemento esencial del delito de motín el que se acuse simultáneamente a los dos o más sujetos activos del delito.* Puede acusarse a uno de ellos y ello será suficiente si se alega que llevó a cabo la conducta prohibida por el tipo legal obrando con dos o más individuos sin autoridad de ley. *Pueblo v. Yoder Hernández,* 101 D.P.R. 360 (1973).

Es un elemento del delito que la conducta constitutiva del motín se lleve a cabo de manera que *se perturbe la tranquilidad pública,* la cual se definió bajo el estado de derecho del Código Penal derogado como *la tranquilidad de un vecindario. Pueblo v. Pacheco,* 48 DPR 602 (1935). Con el transcurso del tiempo algunas jurisdicciones han ampliado el delito de motín para incluir perturbaciones a la tranquilidad de lugares que no son vecindarios, como las instituciones de reclusión. Véase Código Penal de California 87 404, según enmendado en 1978.

En el derecho angloamericano existían tres delitos relacionados. Eran *la asamblea ilícita, el tumulto y el motín. Los mismos se incluyeron en el Código Penal derogado.* La *asamblea ilícita* consistía en reunirse tres o más personas con un plan común en mente que si lo llevaban a cabo generaría un motín. El *tumulto* era el movimiento de las personas que se han reunido ilícitamente para llevar a cabo un designio común; mientras que *el motín* es la *alteración tumultuosa de la paz por dos o más* personas *actuando juntas* en la comisión de un delito mediante *fuerza* o en la ejecución de alguna empresa legal o ilegal de tal manera *violenta, turbulenta* e *ilícita* como para crear la posibilidad de *terror público o alarma.* PERKINS

& BOYCE, 481–485. *Cuando se da el delito de motín confunde dentro de sí los delitos de asamblea ilícita y tumulto. 77 C.J.S. 87 19 (Riot). Esto explica por qué cuando se aprobó el Código Penal en 1974 se derogaron los artículos 361 y 362 sobre tumulto y reunión ilícita.* (Énfasis suplido.)[83]

El Código Penal de 1937 prescribía ciertos y determinados delitos que intervenían y reglamentaban el uso de la libertad de expresión. Estos eran el *motín, tumulto* y la *reunión ilícita.* La conducta delictiva allí tipificada disponía de la forma siguiente:

Art. 359.–(404 Cal.) *MOTIN, DEFINICION.* Todo empleo de *fuerza* o *violencia,* que *perturbare la tranquilidad pública,* o amenaza de emplear tal fuerza o violencia, acompañada de la aptitud para realizarla en el acto, por parte de dos o más individuos, *obrando juntos* y sin autoridad de ley, constituye un *motín.*

Art. 360.–(405 Cal.) *[PARTICIPACION] EN MOTINES.* Toda persona que tomare parte en un motín, incurrirá en pena de presidio por un término máximo de dos años, o multa máxima de dos mil dólares, o ambas penas a discreción del tribunal.

Art. 361.–(406 Cal.) *TUMULTO. DEFINICION.* Si dos o más personas reunidas y *obrando de acuerdo, intentaren* o *hicieren ademán* de cometer un *acto que de realizarse tendría carácter de motín,* tal reunión constituirá un *tumulto.*

Art. 362.–(407 Cal.) *REUNION ILICITA, DEFINICION.* Si dos o más personas se reunieren para cometer un acto ilegal, separándose después sin realizarlo, o sin llevar adelante su ejecución o ejecutar un acto ilegal tumultuosa o desordenadamente, las personas así reunidas constituirán una reunión ilícita.

Art. 363.–(408 Cal.) *PARTICIPACION EN TUMULTO O REUNION ILICITA.* Toda persona que tomare parte en un tumulto o reunión ilícita, incurrirá en [*misdemeanor*].

Art. 364.–(409 Cal.) *PERMANENCIA DE UNA PERSONA EN EL SITIO DEL MOTIN, ETC.* Toda persona que continuare presente en el sitio en que hubiere ocurrido algún motín, tumulto o reunión ilícita, después de haberse amonestado a ésta, conforme a la ley, para que se disperse, excepto los funcionarios públicos y personas que estuviesen prestándole su auxilio para dispersarla, incurrirá en [*misdemeanor*].

---

[83] Nevares-Muñiz, *Código penal de Puerto Rico: revisado y comentado, op. cit.,* págs. 502–503.

Art. 365.–(410 Cal.) *NEGLIGENCIA EN REPRIMIR RE-UNION ILICITA O TUMULTUOSA.* Si un funcionario público, o policía teniendo noticia de alguna reunión ilícita o tumultuosa, de las mencionadas en este capítulo, dejare de constituirse en el lugar de dicha reunión, o tan cerca de la misma como fuere posible sin peligro, y de ejercer la autoridad de que está investido para reprimirla y arrestar a los delincuentes, incurrirá en [*misdemeanor*]. (Énfasis suplido y en el original.) 33 L.P.R.A. secs. 1432–1438 (ed. 1969).

El anterior Código Penal tenía una descripción de conducta tipificada como delito de *motín* similar a la dispuesta en el Código Penal actual. El término *"dos o más personas obrando juntas sin autoridad de ley"* no implicaba bajo el Código Penal anterior que para la comisión del delito de *motín* se tuviera que establecer *"el designio común"* de esas dos o más personas. El anterior Código Penal contenía el elemento de *"designio común"* de dos o más personas para cometer el delito de *"tumulto"*. No obstante, ese delito de *tumulto* comprendía *el intento* o *realización de un ademán* *"por dos o más personas reunidas y obrando de acuerdo"* de cometer un acto que, de realizarse, *tendrían el carácter de la conducta tipificada como motín.* El delito de *tumulto* fue eliminado al aprobarse el actual Código Penal el 22 de julio de 1974.

La Prof. Dora Nevares-Muñiz opina, sobre este asunto, que *"cuando se da el delito de motín confunde dentro de sí los delitos de asamblea ilícita y tumulto"*. (Énfasis suplido.) Ello explica, según la profesora Nevares-Muñiz, por qué cuando se aprobó el actual Código Penal se derogaron las disposiciones específicas sobre *tumulto* y *reunión ilícita*. Si aplicáramos la *regla sobre interpretación declarativa* tendríamos que adscribirle la modalidad *restrictiva* y limitarnos a *entender el lenguaje que claramente se desprende del estatuto, tal y como quedó redactado al ser aprobado,* como la *única expresión* de la *voluntad del legislador,* en *ausencia de una intención legislativa distinta que se desprenda del historial legislativo.* Por ello, al realizar ese ejercicio de interpretación entendemos que la letra del estatuto refleja

claramente la voluntad del legislador de excluir el elemento de "*acuerdo o designio común*" al utilizar el lenguaje de "*dos o más personas obrando juntas y sin autoridad de ley*", como parte de la *actividad delictiva* (*actus reus*) tipificada como delito de motín. *La voluntad del legislador* fue imprimirle *a la aplicación del delito de motín*, como medida que regula el ejercicio "*por dos o más personas*" de la libertad de expresión, de un *ámbito mucho más amplio* que el contenido en el Código Penal anterior.

## IV

Tomando en cuenta que estamos ante la presencia de un estatuto penal (delito de motín) que *tiende a restringir y pretende reglamentar* el derecho constitucional a la *libertad de expresión*, es necesario realizar *un examen riguroso del ámbito* que el Ministerio Público *le ha querido imprimir*, y *el alcance* de su *aplicación*, en esa forma, al aquí peticionario en la etapa procesal en que se encuentra el asunto en el foro primario. Nuestro ministerio revisor nos impone la obligación de evaluar las determinaciones del Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones sobre este asunto y el curso de acción que tomaron ambos foros al considerar y resolver los importantes planteamientos de las partes sobre tal asunto. Ambos foros judiciales adoptaron el estándar menos exigente para que el Ministerio Público sostuviera el delito de motín y el más desfavorable para el aquí peticionario. Veamos.

El Ministerio Público sostuvo ante el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones, que *dos o más personas* podrían incurrir en *una violación al delito de motín*, en la modalidad de participación directa y activa (*autor inmediato*) o, en la alternativa, en la modalidad de "instigar", "ayudar" y "cooperar" con el que participó

directa y activamente (*autor mediato*).[84] Alegó el Ministerio Público que se comete el delito de motín cuando *dos o más personas* —"*autores inmediatos*" o "*autores mediatos*"— incurran en forma *directa* o *indirecta* en "*fuerza y violencia*", describiendo esto como *aquella conducta que no requiere esfuerzo físico* de la persona, sino que *basta con que tal conducta* produzca "*terror o alarma*" en una *persona promedio, perturben la tranquilidad pública* como *consecuencia probable* de *esa conducta*, cuando *aún sin querer tal resultado, puedan preverlo* o, en *la alternativa*, cuando *se produce tal resultado sin quererlo* por su *imprudencia o descuido, falta de circunspección o impericia* o *por no observar la ley*. Adujo que en la modalidad de "*autor mediato*", una persona podría "*ayudar*", "*instigar*" y "*cooperar*" con otra persona que *directa y activamente* (*autor inmediato*) incurra en la conducta antes descrita, *con el simple hecho de utilizar la marca o emblema del grupo* a que *pertenecen ambos*; que está ejercitando su libertad de expresión como grupo, en ejercicio de su libertad de asociación.

El Tribunal de Primera Instancia concluyó que *la participación activa* del aquí peticionario, *junto a otros tres acusados*, lo convirtió en *autor* del delito. Determinó, que éste *no fue un mero observador*. A base de sus inferencias, determinó que llegó al lugar en apoyo del Dr. Carlos I. Pesquera Morales para "*cooperar*" *con él* y que sus actos afirmativos reflejan que "*ayudó*", "*apoyó*", "*instigó*" y "*cooperó*" en la comisión del delito de motín. Sostuvo que tomó su determinación *a base de la prueba de cargo, que ubicó al aquí peticionario en un grupo de personas que estaban pegados a la puerta de la Oficina de la Procuraduría de la Mujer y que tuvo acceso al interior de ese edificio*. Concluyó, además, que *la prueba de cargo lo ubicó directamente detrás del doctor Pesquera Morales*, utilizando "*fuer-*

---

[84] Art. 35(a) y (b) del Código Penal de Puerto Rico, 33 L.P.R.A. sec. 3172(a) y (b).

*za y violencia*" para lograr acceso al referido edificio, *cosa que lograron juntos.* El Tribunal de Primera Instancia determinó que el aquí peticionario incurrió en *la actividad delictiva (actus reus)* imputada, a los efectos de una determinación de causa probable para acusar, en conformidad al derecho aplicable. Ello, *en ambas modalidades de autor de un delito "inmediato" y "mediato".* El foro primario *no particularizó el carácter* de la *"fuerza y violencia"* desplegada y *el rol del aquí peticionario* como *"autor inmediato y mediato"* en tal despliegue. Concluyó que *perturbó la tranquilidad pública* de los empleados de la agencia pública concernida, por haber sido esa *la consecuencia probable de su actividad delictiva* de *"fuerza y violencia", junto a otros,* en *las modalidades de autoría* ya indicadas, porque *no tenía que demostrar el Ministerio Público que el peticionario quería perturbar la tranquilidad pública*; bastaba con *que previera que ese era el resultado* de esa conducta *(mens rea).*

El Tribunal de Circuito de Apelaciones concluyó que el *delito de motín* no requiere que *la persona quiera perturbar la tranquilidad pública; basta* con que *esa sea la consecuencia natural o probable* o que *tal resultado hubiese sido previsible.* Determinó como suficiente que la prueba de cargo *identificó al aquí peticionario y lo ubicó en los eventos* que dan *margen al caso de autos.*

*De la letra* y *el lenguaje del Art. 261* del Código Penal, *supra,* y de la *parte general del Código Penal no surgen guías que contengan estándares explícitos* que dirijan la discreción de la autoridad gubernamental sobre cuál es el *estado mental (mens rea)* requerido para imponer responsabilidad a una persona que haya incurrido en la *actividad tipificada como delito de motín (actus reus). Tampoco surge del historial legislativo* que hemos examinado *la intención del legislador* dirigida a *formular o establecer esas guías.* Tal situación produce *el potencial* de que la autoridad gubernamental *aplique arbitrariamente* ese *estatuto penal.* Es impermisible constitucionalmente dejar en las manos

de *policías, fiscales* y *jueces* la resolución en *forma ad hoc* y sobre *fundamentos subjetivos* cuál *estado mental (mens rea)* aplica a la *actividad tipificada (actus reus)* en el *delito de motín,* cuando aplicarlo representa el potencial de la arbitrariedad y de la intervención indebida o irrazonable del Estado con derechos que protege la Primera Enmienda de la Constitución de Estados Unidos y el Art. II, Secs. 2 y 3 de la Constitución de Puerto Rico, *supra.* El *significado incierto* que el *amplio ámbito* de este estatuto penal *(actus reus* y *mens rea)* le imprime al uso de la libertad de expresión, inevitablemente llevará a los ciudadanos a permanecer mucho más lejos de la *zona formulada subjetivamente como ilegal.* El significado incierto de un estatuto penal que pretende reglamentar el uso de la libertad de expresión, que produce el potencial de arbitrariedad cuando la autoridad gubernamental al ejercer su discreción lo aplica, lleva a los ciudadanos a permanecer mucho más lejos de aquella área que, en *forma subjetiva y ad hoc,* los *policías, fiscales* y *jueces* entendieran constituye la *zona ilegal.* Por eso las fronteras de *la conducta (actus reus)* y el *estado mental (mens rea)* requerido para imponer responsabilidad criminal cuando dos o más personas, en uso de su libertad de asociación, están en el ejercicio de su libertad de expresión, tienen que estar *específicamente demarcadas en el estatuto penal.*([85])

Es constitucionalmente impermisible el ámbito amplio de un estatuto penal que intenta reglamentar el uso de la libertad de expresión, cuando requiere una construcción igualmente amplia para salvar su validez. De requerirse tal ejercicio, el estatuto penal en cuestión sería vago.([86]) En el caso ante nos, el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones aplicaron a la controversia de autos *la intención general* en su modalidad de *consecuencia*

([85]) *Broadrick v. Oklahoma,* 413 U.S. 601 (1973).

([86]) *Virginia v. Kevin Camant Hicks,* 71 U.S. L.W. 4441 (2003); *Hynes v. Mayor of Oradell,* 425 U.S. 610 (1976); *N.A.A.C.P. v. Button,* 371 U.S. 415 (1963).

*natural,* o *probable, en la alternativa,* o, *también en la alternativa, la negligencia* en sus variadas modalidades y manifestaciones. La aplicación de la política pública formulada por el Estado en la tipificación de la conducta delictiva (*actus reus*) y el estado mental (*mens rea*) aplicables, está sujeta y limitada a la garantía a un debido proceso de ley. Por no contar la autoridad gubernamental con guías que formulen estándares explícitos que dirijan su discreción sobre cuál es el estado mental (*mens rea*) aplicable al delito de motín, concluimos que el Tribunal de Primera Instancia y el Tribunal de Circuito de Apelaciones realizaron una construcción sumamente amplia de ese estatuto penal, sosteniendo el uso de su discreción judicial en una evaluación de naturaleza subjetiva sobre cuál es el estado mental (*mens rea*) aplicable.[87] Resolvieron la controversia ante sí sobre el fundamento de que el estado mental aplicable podría ser uno entre varios de los grados de culpabilidad considerados en nuestro Código Penal, excluyendo el más vigente que el Estado puede sostener y el más favorable al aquí peticionario.

## Procesamiento selectivo

El aquí peticionario planteó ante el Tribunal de Primera Instancia, como fundamento para solicitar la desestimación de la acusación formulada en su contra, que fue sometido a un procedimiento criminal en forma selectiva y por motivo de haber sido Presidente del Partido Nuevo Progresista. Le imputó al Estado utilizar su maquinaria de procesamiento criminal en una forma constitucionalmente impermisible, con el propósito de discriminar en su contra por motivo de sus ideas políticas. A nivel del Tribunal de Circuito de Apelaciones planteó que de la prueba desfilada surge que en el lugar había más de cien personas que estaban comprimidas frente y dentro del edificio de la Oficina de la Procuraduría

---

[87] Íd.

de la Mujer. No obstante, sólo fueron sometidos a un proceso criminal el peticionario y otros tres líderes del Partido Nuevo Progresista, cuando en el lugar de los hechos otras personas incurrieron en la comisión de delitos y no han sido encausadas. Expresó que *el delito de motín presupone una "intención específica"* de perturbar la tranquilidad pública. A esos efectos, puntualizó que la interpretación en contrario padece de vicio constitucional. Arguyó, además, que su encausamiento, a través del significado que impartió el Estado a los elementos del delito de motín, constituye una restricción impermisible de los derechos que le garantiza la Primera Enmienda de la Constitución de Estados Unidos. Finalmente, sostuvo que bajo ninguna circunstancia se le puede imprimir a ese estatuto penal un significado que implique que se requiere como elemento la *"intención general"* para incurrir en su violación.

El procesamiento criminal selectivo es materia de una defensa afirmativa que debe *alegar* y *probar* el imputado en el foro de primera instancia, que conlleva establecer un efecto discriminatorio en la aplicación de la ley a su caso y que el proceso en su contra fue motivado por esas razones.[88]

El caso de autos se encuentra en la etapa inicial del procedimiento penal ante la Sala Superior del Tribunal de Primera Instancia, con la formulación de una acusación por delito grave (motín), después de haberse determinado causa probable para acusar al aquí peticionario por ese delito. El peticionario levantó, ante el Tribunal de Primera Instancia, el planteamiento de procesamiento selectivo precisamente frente a la acusación formulada en su contra, que persigue la celebración de un juicio plenario dirigido a la presentación de prueba de cargo para sostener, más allá de duda razonable, las alegaciones contenidas en el referido pliego acusatorio. Durante la vista celebrada ante la Sala Superior de San Juan del Tribunal de Primera Ins-

---

[88] *Pueblo v. Rexach Benítez,* supra; *Wayte v. U.S.,* 470 U.S. 598 (1985).

tancia, para dilucidar la moción de desestimación de la acusación, el aquí peticionario presentó en evidencia copia de la transcripción de la prueba oral que presentó el Ministerio Público durante la celebración de la vista preliminar que, junto a la prueba que presentó el Estado y su teoría sobre el significado amplio del ámbito del delito de motín, aplicable al aquí peticionario, ameritaba que ese tribunal entendiera y resolviera tal planteamiento. Somos del criterio que las actuaciones, posiciones y prueba que presentó el Ministerio Público ante la Sala Superior de San Juan del Tribunal de Primera Instancia, y aquella del aquí peticionario, produjeran el cuadro fáctico y peso probatorio necesarios para que ese tribunal atendiera y resolviera tal asunto. En este caso existe un señalamiento directo y específico del aquí peticionario ante el Tribunal de Primera Instancia sobre procesamiento selectivo. Por todos es conocida la amplia facultad que proseemos de ir más allá de las infracciones de la ley o los quebrantamientos de formas que han señalado las partes con el más alto fin de evitar injusticias.([89])

La prueba de cargo que se presentó durante la vista preliminar reflejó que frente al edificio y dentro de la Oficina de la Procuraduría de la Mujer había muchas personas "apilladas" (sic), que uno de los testigos describió como un grupo de "más de cien". Como parte de ese gran número de personas, se encontraban allí miembros de la prensa con sus cámaras, videos y micrófonos, quienes estaban excitados y trataban de entrar todo el tiempo a la Oficina de la Procuraduría de la Mujer. De las fotografías que se encuentran en los autos, se deduce el cuadro fáctico que describieron los testigos de cargo. Se puede apreciar en algunas de ellas un gran número de personas frente al edificio de la agencia pública en cuestión, participando en una manifestación. Otras fotografías evidencian un gran nú-

---

([89]) *Pueblo v. Colón Obregón*, 102 D.P.R. 369 (1974); *Pueblo v. Serrano Nieves*, 93 D.P.R. 56 (1966).

mero de personas dentro del edificio y en la escalera que conduce a su planta alta. Detrás de ese grupo de personas se puede apreciar un número más grande de personas. Todas estas personas formaron una masa humana compacta, porque estaban tan comprimidos unos con otros, que la palabra "apillados" (sic) que usaron los testigos de cargo para describir la situación es muy adecuada. En las fotografías se puede apreciar la presencia en el lugar, en algunas, del aquí peticionario, de líderes del Partido Nuevo Progresista, de algunos periodistas y, además, de muchas otras personas que participaban en la manifestación.

El Ministerio Público activó su maquinaria de procesamiento criminal contra el aquí peticionario y tres líderes del Partido Nuevo Progresista. Actuó sobre el fundamento de que *perturbaron la tranquilidad pública* con el uso de "*fuerza y violencia*". Argumentó en sus escritos ante el Tribunal de Primera Instancia, en oposición a la solicitud de desestimación, que el significado de "*fuerza y violencia*" del delito de motín *no exigía* que tuviera que demostrar *el uso de esfuerzo físico*, pues bastaba con probar que *su conducta* produjo "*terror y alarma*" en una *persona promedio. No especificó ni describió* en esos escritos en qué *consiste* tal "*fuerza y violencia*". No obstante, de la denuncia y del pliego acusatorio formulado en contra del aquí peticionario, alegó específicamente sobre tal asunto que éste utilizó "*fuerza y violencia*", consistente *en que, en unión a otras personas que lo acompañaban, penetró e irrumpió* en la Oficina de la Procuraduría de la Mujer, ubicada en la Calle Tetuán Núm. 253 del Viejo San Juan, *utilizando diferentes partes de su cuerpo*, mediante *puños, codazos, manotazos, empujones* y de *forma atropellante, logrando acceso* a la antesala de esa oficina, hecho en el que *resultaron lastimadas emocional y físicamente varias personas.* Alegó el Ministerio Público que *estos hechos* son contrarios a la ley, lo que constituye *el delito de motín.* En cuanto al aquí peticionario, alegó que *participó directa y activamente (autor*

*inmediato*) en la comisión del delito o, en *la alternativa,* incurrió en la referida infracción al *"instigar", "ayudar" y "cooperar" (autor mediato)* con el doctor Pesquera Morales, quien alegadamente participaba directa y activamente en la actividad delictiva. Consideró que el aquí peticionario incurrió en el delito de motín .—aunque *no hubiera sido su propósito perturbar la tranquilidad pública—* pues · *bastaba con que pudiera prever* que esa era la *consecuencia probable* de su ejercicio de *"fuerza y violencia"* en *forma directa y activa (autor inmediato)* o, en *la alternativa,* como *"cooperador" (autor mediato).* Alegó que el aquí peticionario produjo *la perturbación de la tranquilidad pública,* en las *dos modalidades de autoría* antes indicadas, en *la alternativa* y como resultado delictuoso, aún *sin quererlo, por una, o en conjunto con otras varias alternativas,* a saber: *imprudencia o descuido, falta de circunspección o impericia,* o *por inobservancia de la ley.* Expresó que en la modalidad de *"autor mediato"* bastaba con que usara la misma *"marca o emblema"* que identificaba a aquel que *participa directa o activamente en la conducta delictiva* y que a la vez identifica a otras personas que se encuentran como grupo en una manifestación. Bajo el significado que el Ministerio Público le imprimió al ámbito del delito de motín y le aplicó al aquí peticionario, y analizada la prueba de cargo que presentó el Estado durante la vista preliminar, le debió aplicar el mismo criterio a un gran número de personas allí presentes que identificaron y describieron los testigos de cargo y que reflejan las fotografías, como incursos en una conducta igual o similar a la observada por el aquí peticionario, y que no fueron sujetos de procedimiento criminal alguno.([90])

---

([90]) A modo ilustrativo, cabe mencionar la declaración de testigos de cargo sobre otras personas, quienes no fueron acusadas por lo actos ocurridos ese día. Se describe la conducta de esas personas como que utilizaron "fuerza y violencia", mientras que al peticionario lo colocan solamente como presente en el lugar. Véase Apéndice del recurso de *certiorari,* págs. 211, 212, 334, 483, 491, 496, 499, 502, 506, 510, 511, 521, 531, 535, 559, 572, 591, 594, 596, 597, 598, 629, 651, 652, 670, 673, 677, 681, 695 y 721.

Lo establecido por el aquí peticionario con la presentación en evidencia de la transcripción de la prueba oral desfilada en la vista preliminar, por el propio Ministerio Público a través de sus escritos ante el Tribunal de Primera Instancia y por la prueba desfilada por éste durante la vista evidenciaria ante ese foro, para fundamentar y sostener su oposición a la moción de desestimación presentada por el aquí peticionario, estableció *prima facie* fuertes indicadores de que existe un fundamento aparentemente genuino de que estamos ante un impermisible encausamiento criminal selectivo por razones políticas.[91] Una vez establecido *prima facie* tal cuadro fáctico, el curso de acción que tomará el foro primario no es ordenar el archivo de la causa criminal. No obstante, tenía que permitirle al Ministerio Público que demostrara la legitimidad y validez de su actuación.[92] Concluimos que erró el Tribunal de Circuito de Apelaciones al no resolver en sus méritos tal asunto, dentro de su ministerio revisor.

Sobre este tema, y dentro de un marco fáctico similar, en *Pueblo v. Rexach Benítez*, supra, expresó en su opinión disidente el Juez Asociado Señor Rebollo López lo siguiente:

> La mayoría del Tribunal, en un intento de contrarrestar nuestro señalamiento sobre "procesamiento selectivo" del Senador Rexach Benítez, expresa, en síntesis, que: (1) dicho planteamiento *no ha sido levantado por el Senador Rexach Benítez*, esto es, que ha sido planteado motu proprio por el Juez suscribiente a "destiempo"; (2) la posición que el Juez suscribiente hoy asume —de "resolver" el señalamiento en esta etapa de los procedimientos— resulta ser, conforme la Mayoría, contradictoria con la posición que asumimos en el pasado en el caso *Hernández Colón v. Srio. de Hacienda*, ante; (3) "la *prominencia pública* del acusado y el hecho de que sea *miembro de una minoría*, o la *supuesta ausencia de acusación a otros supuestos violadores, de por sí*, tampoco [le] permite [al Tribunal] pasar juicio sobre la alegación de discrimen traída por la opinión disidente", (énfasis suplido y en el original) opi-

---

[91] *U.S. v. Amstrong*, 517 U.S. 456 (1996); *Wayte v. U.S.*, supra.

[92] *United States v. Saade*, 652 F.2d 1126, 1135 (1er Cir. 1981).

nión mayoritaria, pág. 281, y (4) lo "ocurrido en el Senado de Puerto Rico no impedía que el Departamento de Justicia investigara y formulara los cargos que procedieran en derecho". Opinión mayoritaria, pág. 282.

Verdaderamente resulta ser innecesario extenderse mucho en la "refutación" de dichos señalamientos. Los mismos realmente constituyen un lastimoso esfuerzo de la mayoría por justificar su incomprensible actitud de inacción —por segunda ocasión en el corto término de cinco (5) años— ante la cruda, y jurídicamente indeseable, utilización por parte del Estado del proceso criminal como mecanismo de persecución política en este País. (Énfasis suplido y en el original.)

## V

*Moción de desestimación bajo la Regla 64(p) de Procedimiento Criminal*

Una vez se decide celebrar la vista preliminar, para que el magistrado que la preside pueda ordenar la detención del imputado de delito y proceda la formulación de una acusación por un delito grave, la prueba debe demostrar que existe causa probable para creer que cometió un delito y que el imputado fue su autor. *Vázquez Rosado v. Tribunal Superior*, 100 D.P.R. 592 (1972).

El Tribunal de Primera Instancia entendió que el caso de autos no se trata de uno en que existe ausencia total de prueba. Para derrotar la presunción legal de corrección que cobija a la determinación de causa probable para acusar realizada por el juez instructor, el acusado peticionario tenía que demostrarle al juez que entendió en la vista preliminar celebrada como consecuencia de la solicitud de desestimación de la acusación al amparo de la Regla 64(p) de Procedimiento Criminal, *supra*, que existe *ausencia total de prueba* en cuanto a uno o más de los elementos del delito de motín.[93]

Este Tribunal ha dispuesto claramente los requisitos bajo los cuales está supeditado el examen judicial que rea-

[93] *Pueblo v. Rivera Alicea*, 125 D.P.R. 37 (1989).

liza el Tribunal de Primera Instancia de una Moción al amparo de la Regla 64(p) de Procedimiento Criminal, *supra*. En *Pueblo v. Rivera Alicea*, 125 D.P.R. 37, 42–43 (1989), formulamos como norma lo siguiente:

> El análisis adecuado, para resolver una moción de desestimación al amparo de dicha regla, *requiere examinar la prueba de cargo y defensa vertida en la vista preliminar y la producida por el imputado durante la vista de desestimación.* A la luz de los elementos del delito imputado el juzgador debe determinar si tal prueba establece la *probabilidad* de que estén presentes *todos* los elementos, a saber, la probabilidad de que se haya cometido tal delito imputado. Concomitante a dicho examen, debe determinar si hay prueba que probablemente conecte al imputado con el delito probablemente cometido. (Énfasis suplido y en el original.)

De la transcripción de la prueba de cargo que desfiló durante la celebración de la vista preliminar se deduce que los testigos que utilizó el Ministerio Público para lograr la determinación de causa probable para acusar al aquí peticionario por el delito de motín declararon lo siguiente:

> P  ¿Cómo estaba el ambiente para ese momento?
> R  Caldeado obviamente, estaba [sic] mucho grito, que no los dejen pasar, que se queden adentro, continuaba ... según se excitaba la gente, pues el señor Pesquera volvía y dada otra vez cantazos en la puerta y empujones. Todo el tiempo la puerta se mantuvo en empujones. Ya para ese entonces estaba *el Sr. Leo Díaz* también detrás del Sr. Carlos Ignacio Pesquera.
> P  ¿Quién es el *Sr. Leo Díaz*?
> R  *El Sr. Leo Díaz, el señor que está al lado del Sr. Edwin Mundo*. El caballero que está al lado del Sr. Edwin Mundo.
> P  ¿De qué color es su camisa?
> R  Azul también.
> Para fines de la grabación, Vuestro Honor, que refleje *que se identificó al Sr. Leo Díaz*.[94]
>
> P  Cuando usted dice "adentro" a qué se refiere.

---

[94] Apéndice del recurso de *certiorari*, págs. 422–423.

R   Adentro de la oficina, adentro, ya no en el "lobby", dentro de las oficinas. Sale este joven, muchacho joven y le hace frente y le dice dos o tres cosas a Dennis.

R   ¿Quién es esa persona?

P   Es un muchacho joven, creo que es el presidente de los estadistas, la juventud estadista del partido republicano de Puerto Rico.

P   ¿Y qué pasó?

R   Ahí llega la Comandante Wanda Rivera y el otro teniente, que desconozco su nombre, uno trigueño él con camisa blanca, con su casco bien puesto y entonces logran dominar al muchacho y lo sacan hacia fuera. Luego de eso, que Pesquera logra poner su ... después de haberse llevado a dos o tres personas, logra poner su bandera, salen hacia fuera y salen con ellos, al ellos salir termina el motín y el caos y el desasosiego que allí existió. Tan pronto ellos salen vuelve la paz.

P   ¿Cuántas personas o usted reconoce qué personas lograron acceso a la primera planta para poner la bandera?

R   El *señor Pesquera, la señora Jennifer*, estaba en el *Sr. Rivera Schatz*, estaba ... *había bastante gente de ellos arriba; la prensa, obviamente tirando fotos*, pero yo te podría decir que ... y *Leo Díaz estuvo arriba también*, ya en primer nivel ....

P   ¿*Cuando se abrió la puerta dónde estaba el Sr. Leo Díaz?*

R   *Detrás del Sr. Carlos Ignacio Pesquera, justamente detrás.*[95]

LCDO. ALONSO SANTIAGO:

P   ¿Señor, a preguntas del fiscal usted dice que en un momento dado la puerta se abre y que entran las personas?

R   *Que yo abrí la puerta.*

P   *Usted abrió la puerta, usted abrió la puerta. Y entraron las personas.*

R   *Eso es correcto.*

P   *Policías, periodistas ....*

R   *Los que estaban al frente, todos ellos que estaban al frente. Pesquera, el primero que entró y así por el estilo.*

P   *Y también usted vio entrar con él policías también.*

R   *Entró todo el mundo, todo el que estaba allí.*

P   *Todo el que estaba allí. ¿Pero habían policías también allí?*

R   *Sí, sí.*

P   *Y estaban subiendo por allí.*

R   *Se metieron a ayudar a poner la ... a parar el ....*

P   *Pero subieron.*

---

[95] Íd., págs. 430–431.

R   *Sí, se metieron, claro.*

P   *¿Y ellos se metieron a ayudar a poner la bandera?*

R   *A forcejear, a parar el gentío, ayudar.*

P   Le voy a presentar unas fotos que creo que están como Exhibit 1–F, 1–B y 1–G para que los mire. ¿Las vio?

R   Sí.

P   Le pregunto si en este instante que está sucediendo esto que usted está viendo en la foto ....

MINISTERIO PUBLICO:

¿Cuál foto?

LICENCIADO ALONSO SANTIAGO:

P   ... en las fotos de ahorita....

MINISTERIO PUBLICO:

Las tres.

LCDO. ALONSO SANTIAGO:

P   *... las tres fotos, si los compañeros o los jefes de esa agencia le están diciendo "déjalos subir, déjalos subir".*

R   *¿En estos momentos?*

P   *Sí.*

R   *No, en estos momentos no.*

P   *No en estos momentos. Le pregunto si en esa foto y en algún momento dado usted ve al Sr. Leo Díaz ahí.*

R   *No, no se ve a Leo Díaz en ese momento.*

P   *No lo ve. Ahora le voy a preguntar si en el Exhibit 1–H, mire a ver qué es lo que refleja el Exhibit 1–H. ¿Si ahí lo ve?*

R   *No, aquí tampoco aparece.*

P   *Tampoco. Le voy a presentar el Exhibit 1–1 y el 1–E y el 1–K y el 1–A y el L. ¿Lo vio?*

R   *Sí.*

P   *¿Dónde está?*

R   *Si no me equivoco, es este caballero que está aquí entre Iris Miriam Ruiz, el teniente y Dennis, es él. Este caballero que está aquí es él.*

P   *¿Lo que usted nos enseña es una cabeza?*

R   *Ese.*

P   *¿Una cabeza?*

MINISTERIO PUBLICO:

Juez, pero aquí el compañero no puede estar testificar [sic].

LCDO. ALONSO SANTIAGO:

No, pero es una ... Perdóneme, es una ....

P   Explíquele a la Juez.

MINISTERIO PUBLICO:

El compañero lo que está diciendo "es una cabeza".

TESTIGO:

R   Según en la posición en que él estaba, que era él que estaba detrás del señor Carlos Pesquera.

**LCDO. ALONSO SANTIAGO:**

P ¿Qué es lo que se ve?

**MINISTERIO PÚBLICO:**

Lo que pasa que el compañero preguntó …

**TESTIGO:**

R Pues, eso es lo que se ve, pero él estaba.

**MINISTERIO PÚBLICO:**

… y entonces él le contestó.

**HON. JUEZ:**

Ya respondió, licenciado.

**LCDO. ALONSO SANTIAGO:**

P *Enséñeselo a la Juez. ¿Vio el rostro de él ahí?*

R *Ahí en la foto, no.*

P *No. Y ahora el Exhibit 2–1 y el 1–Q. ¿Qué es lo que usted ve … qué es lo que refleja esa foto?*

R *Mucha gente en la carretera.*

P *¿Esas eran las personas que estaban allí? Sí.*

R *Eso es así.*

P *Entréngueselo al … (ininteligible). ¿Esos son los manifestantes?*

R *Eso es así.*

P *Eso es así. ¿Estaban ellos haciendo conducta desordenada, esos manifestantes?*

R *Hasta lo que se ve en la foto, no.*

P *No.*[96]

.　.　.　.　.　.　.　.　.

**MINISTERIO PÚBLICO:**

P Pero diga lo que usted vio, que usted indica que estaba por encima de las demás personas.

R Porque él estaba sobre algo que lo elevaba a un nivel mayor y él no mide 7 pies, ni 8 ni 9.

P ¿Después de eso usted lo ve en dónde?

R Justo en la puerta de entrada donde … ahí es que él le dice a los periodistas "nosotros los dejamos entrar a ustedes, ahora ustedes nos tienen que garantizar entrar".

P ¿Usted sabe dónde está ese señor el día de hoy?

R Creo que está aquí.

P ¿Cree o está segura?

R Estoy segura.

P Pues, búsquelo y señálelo, por favor.

R Es la persona que está vestida con blusa azul y una corbata de varios colores con traje negro, que en este momento me hace una guiñada.

P El señor que usted indica que estaba allí, indique las per-

---

[96] Íd., págs. 516–519.

sonas que usted vio en ese momento además de Edwin Mundo, qué personas estaban allí que usted reconozca.

R    Que yo reconozca, pues, ahí estaba la Sra. Miriam Ramírez, estaba el señor Pesquera, estaba un joven que después me indicaron que era el hijo del señor Pesquera, estaba el Sr. Leo Díaz ....

P    *¿Estaba el Sr. Leo Díaz? ¿Dónde usted lo vio allí, en ese sitio dónde lo ve?*

R    *Ubicado entre las personas que estaban después de los que estaban pegados a la puerta.*

P    *¿Este señor usted lo ve, dónde está al día de hoy?*

R    *Aquí.*

P    *¿Podría también ubicar dónde está, por favor?*

R    *Sí, al lado del Sr. Edwin Mundo.* (Énfasis suplido.)([97])

No existe dentro de la transcripción de la prueba oral otra alusión al aquí peticionario que hicieran los testigos de cargo que desfilaron durante la celebración de la vista preliminar. De las fotografías presentadas en evidencia, en las cuales aparece el aquí peticionario, no surge rol alguno de su parte en capacidad de "autor inmediato o mediato" en la comisión del delito de motín.([98])

A tenor con lo anterior, concluimos que erró el Tribunal de Circuito de Apelaciones al confirmar al Tribunal de Primera Instancia en su determinación de declarar sin lugar la moción de desestimación presentada por el aquí peticionario. Existe *ausencia total en la prueba de cargo* que desfiló durante la vista preliminar, en cuanto al aquí peticionario, sobre el elemento de "fuerza o violencia" que estipula el Art. 261, *supra*, como parte de la actividad delictiva (*actus reus*) y del estado mental de intención específica (*mens rea*), necesarios para incurrir en su infracción, a tenor con el significado que estamos obligados a imprimirle por imperativo de la garantía a un debido proceso de ley y de la norma estatutaria sobre interpretación de los estatutos penales vigente en Puerto Rico.

---

([97]) Íd., págs. 590–591.

([98]) Íd., págs. 717–721. Fotografías identificadas con los números 14, 15, 16, 18, 19, 32, 37 y 43.

## VI

Por todo lo antes expuesto, expediríamos el auto de *certiorari* solicitado y revocaríamos la sentencia dictada por el Tribunal de Circuito de Apelaciones. Desestimaríamos la acusación presentada ante el Tribunal de Primera Instancia contra el aquí peticionario por el delito de motín.